JAMES, Appellant,

v.

JAMES, Appellee.

[Cite as *James v. James* (1995), 101 Ohio App.3d 668.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 94–CA–62.

Decided March 15, 1995.

670

*Terry Lewis,* for appellant.

*E. Craig Carretta,* for appellee.

FAIN, Judge.

Plaintiff-appellant Robert L. James appeals from a judgment of the trial court adopting a referee's report and recommendation and also from the denial of his motion for a new trial. Mr. James contends that the referee to whom his case was referred was required by Canon 3 of the Code of Judicial Conduct to disqualify himself from hearing the case because of his prior associations with defense counsel. Further, Mr. James contends that the referee's involvement

with the case created an appearance of impropriety and thereby constituted an irregularity in the proceedings necessitating a new trial.

We agree that the referee had a duty to avoid the appearance of impropriety by disqualifying himself from participating in the present case. We also agree that the trial court abused its discretion when it denied Mr. James's motion for a new trial. Therefore, the judgment of the trial court is reversed, and this cause is remanded for a new trial.

I

Plaintiff-appellant Robert L. James and defendant-appellee Shirley A. James were married on September 19, 1957. In September 1991, Mr. James filed a complaint for divorce in Greene County, Ohio.

In July 1992, a hearing was held before a referee to determine the grounds for divorce and the division of the marital property. At the hearing, Mr. James was represented by attorney Stanley Greenberg. Throughout all the proceedings of this case, including the hearing before the referee and the present appeal, Mrs. James has been represented by attorney E. Craig Carretta.

It is an uncontroverted fact that the referee and defense counsel Carretta were previously associated as partners in the law firm of Carretta, Cartwright, Cornish & Brezine Co., L.P.A.

After presiding over the hearing, the referee filed his initial report and recommendation on July 13, 1992, and a supplemental report and recommendation on July 16, 1992. Mr. James filed timely objections to the report and recommendation, which asserted errors regarding the distribution and valuation of marital assets, but he failed to include a transcript. The trial court overruled the objections and adopted the referee's report and recommendation.

Subsequently, substituted counsel for Mr. James, attorney Terry L. Lewis, filed a motion for reconsideration of the objections to the report and recommendation and sought an extension of time to obtain and to file the transcript of the proceedings. The trial court granted the motion. After the transcript was filed, the trial court reconsidered the objections previously filed by Mr. James's former attorney, and again overruled the objections in a judgment entry filed on January 27, 1993.

Two days later, Mr. James filed a new set of objections to the referee's report and recommendation and requested reconsideration of the January 27, 1993, judgment entry based on the new and more specific objections. The new objections again asserted errors in distribution and valuation of the marital assets and, for the first time, raised an objection to the referee's participation in the

case. The trial court refused to consider the new set of objections, which it determined to be untimely, and denied the motion for reconsideration.

Mr. James then filed a motion for a new trial, which again raised the issue of the appearance of impropriety created by the referee's involvement in the case. Before a decision on the motion for a new trial was entered, Mr. James filed a notice of appeal to this court. Upon remand of the case for lack of a final order, the trial court overruled the motion for a new trial.

Mr. James appeals from the judgment and from the denial of his motion for a new trial.

## II

Mr. James's First Assignment of Error is as follows:

"The trial court abused its discretion when it refused to consider appellant's objections to the report and recommendation of the referee or to grant the appellant a new trial, where the referee and opposing counsel have created an appearance of impropriety."

■ Civ.R. 53(E)(2) requires that objections to a referee's report and recommendation be filed within fourteen days of the filing of the report and recommendation. The objections to the report and recommendation that raised the appearance of impropriety issue were not filed until January 29, 1993, more than six months after the filing of the referee's report and recommendation. Therefore, the objections filed on January 29, 1993, were untimely. Accordingly, the trial court did not abuse its discretion when it refused to consider the appearance of impropriety issue as raised in the untimely objections to the referee's report and recommendation.

■ Although the appearance of impropriety issue was untimely raised as an objection to the referee's report and recommendation, it was properly raised in the motion for a new trial based on irregularity in the proceedings. Mr. James contends that the trial court abused its discretion when it denied his motion for a new trial. Mr. James asserts that because defense counsel Carretta and the referee in this case previously practiced law together, the referee's involvement in the case violated Canon 3 of the Code of Judicial Conduct, and thereby constituted an irregularity in the proceedings of the trial court necessitating a new trial. We agree.

■ A motion for a new trial rests within the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal unless there is an abuse of discretion. *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976.

Mr. James's objections to the referee's involvement in the case are specifically based on these uncontroverted facts: (1) until January 1, 1992, the day when the referee was appointed as a full-time referee, the referee practiced law in association with defense counsel, E. Craig Carretta, at Carretta, Cartwright, Cornish & Brezine Co., L.P.A.; (2) after the referee was installed as a full-time referee, he terminated his association with Mr. Carretta; (3) in September 1991, when defense counsel Carretta filed the answer and counterclaim in the present case, the referee and Mr. Carretta were practicing law in association with one another at Carretta, Cartwright, Cornish & Brezine Co., L.P.A.; and, (4) although the referee's association with Mr. Carretta ended several months before this case was referred to him, their association continued to be advertised in the 1992 Yellow Pages advertisement for Carretta, Cartwright, Cornish & Brezine Co., L.P.A.

Mr. James's assertions that the referee was disqualified from hearing the present case are based on two different provisions of Canon 3 of the Code of Judicial Conduct. First, Mr. James asserts that because the referee and Mr. Carretta were associated at the time when Mr. Carretta filed the answer to the complaint in the present case, the referee was disqualified from hearing the case pursuant to the specific disqualification requirement of Canon 3(C)(1)(b). Next, Mr. James asserts that because the association between the referee and Mr. Carretta continued to be advertised in a Yellow Pages phone directory at the time when the referee issued his report and recommendation in the case, the referee's participation in the case was in violation of the general disqualification provision of Canon 3(C).

■ Referees who perform judicial functions are bound to adhere to the Judicial Code of Conduct. *In re Reiner* (1991), 74 Ohio App.3d 213, 219, 598 N.E.2d 768, 772; Board of Comm. on Grievances and Discipline, Op. No. 91–20. The Preface of the Code of Judicial Conduct states that the provisions set forth in the Code are mandatory requirements unless otherwise indicated. Moreover, the disqualification provisions of the Code of Judicial Conduct, which are indicated by the use of the word "should," have specifically been interpreted to be mandatory, rather than discretionary provisions. *Cuyahoga Cty. Bd. of Mental Retardation v. Assn. of Cuyahoga Cty. Teachers of the Trainable Retarded* (1975), 47 Ohio App.2d 28, 33, 1 O.O.3d 168, 171–172, 351 N.E.2d 777, 782.

■ The Code of Judicial Conduct is concerned with the appearance of impropriety as well as with actual bias and prejudice. The Supreme Court of Ohio has stated that " '[n]ext in importance to the duty of rendering a righteous judgment is that of doing it in such a manner as will beget no suspicion of the fairness or integrity of the judge.' " *State ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 471, 58 O.O. 315, 319, 132 N.E.2d 191, 197 quoting *Haslam v.*

*Morrison* (1948), 113 Utah 14, 20, 190 P.2d 520, 523–524. Moreover, Canon 2 of the Code dictates that "[a] judge should avoid impropriety *and* the appearance of impropriety in all his activities." (Emphasis added.)

Canon 3 of the Code of Judicial Conduct specifically requires disqualification as a remedy for situations involving the appearance of impropriety. Canon 3 generally provides that "[a] judge should perform the duties of his office impartially and diligently." In order to meet this obligation, Canon 3(C) sets forth the following general standard: "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." With respect to Canon 3(C)'s general standard for disqualification, the Supreme Court of Ohio's Board of Commissioners on Grievances and Discipline has explained that "[t]he public's perception of impartiality is a measure of whether a judge or referee should disqualify him/herself. 'Any conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is the basis for the judge's disqualification.'" Board of Commissioners on Grievance and Discipline Op. No. 91–20 at 2, quoting E. Thode (1973), Reporter's Notes to Code of Judicial Conduct 60.

In addition to the general provision of Canon 3(C) mandating disqualification, Canon 3 also enumerates four specific examples of situations when a judge's impartiality might reasonably be questioned, thereby rendering disqualification the appropriate action. Canon 3(C)(1)(b) provides that a judge should disqualify himself from hearing a case in which his impartiality might reasonably be questioned, including a situation where "a lawyer with whom he previously practiced law served during such association as a lawyer on the matter."

By adopting Canon 3(C)(1)(b), the Supreme Court of Ohio has already determined that if a judge were to hear a case that was handled by the judge's former legal associate during the time of their association, the ability of the judge to be impartial would reasonably be questioned. In order to avoid suspicion of the fairness and the integrity of the judicial process that might result from the judge's involvement in such a case, the Supreme Court has mandated recusal.

The uncontroverted facts of the present case establish that Mr. Carretta served as the lawyer for Mrs. James and filed the answer and counterclaims in the present case during the time that the referee was associated with him at Carretta, Cartwright, Cornish & Brezine Co., L.P.A. Accordingly, the facts of the present case embody the very situation that Canon 3(C)(1)(b) was intended to prevent: the referee acted as a judicial officer in a case that was handled by his former associate during the time of their association. By doing so, the referee violated his mandatory duty to disqualify himself from the case pursuant to Canon 3(C)(1)(b).

■ Furthermore, the referee's disqualification was mandated pursuant to the general disqualification standard set forth in Canon 3(C). To be sure, a judge or referee is not required to disqualify himself every time a former associate appears before him. To determine if disqualification is appropriate in such a circumstance, the totality of the facts surrounding the association should be examined, including the nature and extent of the prior association, the length of time since it has been terminated, and any tangential personal association that may have sprung from the professional association. Annotation, 85 A.L.R.4th 700, Section 2[a].

The association between Mr. Carretta and the referee was severed only seven months before Mr. Carretta tried the case to the referee. There was not a sufficient lapse in time between the time that the referee practiced law with Mr. Carretta and the time that he acted in a formal judicial capacity in the case. The association clearly had not been severed in the eyes of the public, as evidenced by the advertisement for their law firm, which ran throughout the entire year of 1992.

Based on these facts, we conclude that the public's confidence in the referee's impartiality in this case has been undermined to an extent requiring reversal of the result. Accordingly, the referee's disqualification was mandated by the general standard set forth in Canon 3(C). We emphasize that there is nothing in this record to suggest that the referee's prior association with defense counsel actually influenced his disposition of the case in any way. However, the *appearance* of impartiality, which is of independent significance, has been compromised to an impermissible extent.

While admitting the previous association between attorney Carretta and the referee, Mrs. James contends, nevertheless, that the motion for a new trial was properly denied. This conclusion is based on Mrs. James's assertion that before hearing the case, the referee fully explained his prior relationship with Mr. Carretta to Mr. James's trial attorney, Mr. Greenberg, and volunteered to step down from the case. Mrs. James asserts that Mr. Greenberg chose to proceed with the referee, and thereby waived Mr. James's right to object to the referee's participation in the case.

However, these assertions by Mrs. James are not supported by the record. The record provided to us on appeal, including a transcript of the proceedings before the referee, is devoid of any indication that the alleged disclosure and waiver occurred. It is axiomatic that as an appellate court, we are bound by the record in determining matters on appeal. Therefore, without some indication in the record that the conflict was disclosed by the referee and that any objection was waived by the parties, we cannot find any such waiver.

■ ·Moreover, Mrs. James's assertion incorrectly assumes that the alleged waiver made by attorney Greenberg on behalf of Mr. James would cure the mandatory disqualification requirements of Canon 3(C)(1)(b). Canon 3(D) does provide a procedure for remittal of disqualification.[1] However, the canon limits the use of the remittal procedure to disqualification by reason of Canon 3(C)(1)(c), economic interest, or by Canon (C)(1)(d), family relationship. See Board of Commissioners on Grievances and Discipline, Op. No. 91–20. It is apparent from a reading of the remittal section that remittal is not an option for disqualification based on the situations enumerated in 3(C)(1)(b).

Furthermore, the remittal procedure set forth in Canon 3(D) requires a *written* remittal agreement, which must be signed by all the parties *and* all of the lawyers, and which must be made part of the record. Accordingly, the alleged oral waiver made by Mr. James's attorney would have been insufficient to waive the disqualification mandated by Canon 3(C)(1)(b), even if it could be demonstrated upon this record.[2]·

We agree with the statement in *Cuyahoga Cty. Bd. of Mental Retardation, supra,* 47 Ohio App.2d 28, 1 O.O.3d 168, 351 N.E.2d 777, that a judge cannot "openly disregard [the mandatory disqualification standards of Canon 3] subject only to retrospective disciplinary actions against himself, with no effect upon the improper actions which the canons were designed to protect against." *Id.* at 33–34, 1 O.O.3d at 172, 351 N.E.2d at 782–783.

By not complying with the mandatory disqualification provisions set forth in Canon 3(C) and 3(C)(1)(b) of the Code of Judicial Conduct, the referee's participation in the case before us subjects the judgment of the trial court to legitimate

---

**1.** Canon 3, Section D, entitled "Remittal of Disqualification" is as follows:

"A judge disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding."

**2.** Although proof in the record of the alleged waiver may not have satisfied the requirements for remittal, it may have raised a question as to whether Mr. James had knowledge of the basis for disqualification earlier in the proceedings, therefore raising a question as to whether he waived his right to object to the referee's participation in the case by not objecting earlier. See *In re Disqualification of Pepple* (1989), 47 Ohio St.3d 606, 546 N.E.2d 1298. However, without any indication in the record that the prior association between the referee and defense counsel was disclosed to Mr. James before the hearing, there is nothing in the record to dispute Mr. James's averment in his affidavit that he did not learn of the basis for disqualification until after the hearing took place. Consequently, there is nothing in the record to indicate that Mr. James waived his right to object to the referee's participation by not objecting earlier than he did.

questions regarding the impartiality of the judicial proceedings. We are careful to note that this case does not involve any charges of actual bias or impartiality on the part of the referee; rather, the decision is based entirely upon the appearance of impropriety created by the referee's failure to disqualify himself in accordance with the compulsory obligations of Canon 3. Because our system of justice is dependent upon the public's confidence in the integrity and impartiality of the judicial system, this appearance of impropriety cannot be ignored.

Accordingly, because the facts establishing the appearance of impropriety in the present case are uncontroverted, and because the referee's participation in the case was a clear violation of the mandatory disqualification provisions of Canon 3(C) and Canon 3(C)(1)(b), we conclude that the trial court abused its discretion by denying Mr. James's motion for a new trial based on the irregularity in the proceedings.

Mr. James's First Assignment of Error is sustained.

## III

Mr. James's Second Assignment of Error is as follows:

"The trial court abused its discretion in adopting the report and recommendation of the referee, by failing to consider the appellant's objections and refusing to grant the appellant a new trial where the referee misunderstood the relationship between the appellee's expert and the court."

In our view, Mr. James's Second Assignment of Error has been rendered moot under App.R. 12(A)(1)(c) by our ruling on the First Assignment of Error. Presumably, the factfinder in any subsequent hearing upon remand will not suffer any misunderstanding as to the alignment of Mrs. James's expert witness. The Second Assignment of Error is overruled as moot.

## IV

Mr. James's Third Assignment of Error is as follows:

"The trial court abused its discretion in adopting the report and recommendation of the referee, by failing to consider appellant's objections and refusing to grant appellant a new trial with respect to distribution of the parties' assets."

Mr. James's Third Assignment of Error has also been rendered moot under App.R. 12(A)(1)(c) by our ruling on the First Assignment of Error. Therefore, the Third Assignment of Error is overruled as moot. However, we will address the questions of law raised by the specific objections within this assignment of error for whatever assistance it may be to the trial court on remand, the parties having briefed these issues.

■ When presented with the task of dividing marital property, the trial court is bound by the requirements of R.C. 3105.171, which require the court to "divide the marital and separate property equitably between the parties." The statute provides that the division of marital property should be equal unless an equal division would not be equitable, in which case the court shall divide the property in a manner that it determines to be equitable. In making its division and any distributive award, the court is required to consider the factors set out in subsection (F) of the statute, although the statute prescribes no specific method of valuation or distribution for the court to follow. R.C. 3105.171(C)(1); *Focke v. Focke* (1992), 83 Ohio App.3d 552, 554, 615 N.E.2d 327, 328.

■ When reviewing the trial court's marital property division, the reviewing court is limited to determining whether, considering the totality of the circumstances, the trial court abused its discretion in fashioning the award. *Id.* at 555, 615 N.E.2d at 328–329. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. Moreover, a reviewing court should not review discrete aspects of the property division out of the context of the entire award, but should consider the distribution within the context of the entire award. With these principles in mind, we will address, in turn, each of Mr. James's objections to the trial court's distribution of the marital property.

"A. An expert's evaluation which does not consider a mandatory buy-out provision, the expense of operating a business, a reasonable appraisal of the business assets of the value of the business or net income cannot be utilized as a foundation for determining a business value."

Mr. James is a fifty-per-cent owner of a small, closely held corporation, Budget Tax and Accounting, Inc. The business reported losses in 1989, 1990, and 1991. For at least three years preceding the property distribution hearing, Mr. James earned approximately $10,000 per year for his work as a tax preparer at his business during the four-month tax season.

The referee valued Mr. James's fifty per cent interest in the business at $31,500. In reaching this value, the referee rejected the expert opinion of Randall Kuvin in favor of the opinion of Ronald Russell, because the referee found Mr. Russell's testimony to be more credible based on the depth of his analysis of the business documents supplied by Mr. James.

Mr. James asserts that the trial court abused its discretion by using Mr. Russell's evaluation as a foundation for its valuation of the business because Mr. Russell failed to take into consideration the "multitude of circumstances of the corporation" by blindly applying the "gross receipts formula." Specifically, Mr.

James asserts that Mr. Russell's valuation did not give proper consideration to the existence of a buy-sell provision and the low salaries earned by the owners when assessing the fair market value of Mr. James's share of the business. We agree.

The trial court enjoys broad discretion in determining the value of a marital asset; however, this discretion is not limitless. Our task on appeal is not to require the adoption of any particular method of valuation, but to determine whether, based on all the relevant facts and circumstances, the court abused its discretion in arriving at a value.

The uncontroverted evidence presented at the hearing established that all the shares of Budget Tax and Accounting, Inc. were encumbered by a mandatory buy-sell agreement set forth in the articles of incorporation. Therefore, instead of permitting the sale of shares on the open market, the agreement requires Mr. James and Dottie Glaze, as co-owners of the closely held corporation, first to offer to sell their shares in the business to the other co-owner for $10 per share. The evidence also established that the business did not provide its owners with any dividends or retained earnings, but only provided compensation for their work as tax preparers. Moreover, the evidence established that the owners earned less on an hourly basis preparing taxes for their own company than they could have earned as entry level tax preparers elsewhere.

In adopting $31,500 as the value of Mr. James's share in the business, the trial court relied solely on the methodology asserted by Mr. Russell. However, in assessing the value of Mr. James's share of the business, Mr. Russell's methodology did not account for the effect of the buy-sell agreement. Although Mr. Russell was aware of the existence of the buy-sell agreement, he stated that the agreement "would not affect his valuation." His valuation method was also unaffected by the lack of profitability of the business.

Mr. Russell valued Mr. James share of the business by calculating a theoretical market value of the entire business through the use of the "gross receipts formula," a formula that computes the value of a business based on its gross receipts. Based on the formula, Mr. Russell determined that the whole business had a market value of between $63,000 and $83,000, and therefore Mr. James's fifty-per-cent interest was worth between $31,500 and $41,500.

Under the circumstances, we find it impossible to understand how the value of Mr. James's shares would remain unaffected by the buy-sell agreement and the low level of compensation provided to the owners. Accordingly, we conclude that the trial court abused its discretion by relying solely upon a valuation method that failed to account for significant factors affecting the value of the business.

"B. Where the referee fails to include all of the assets held by one of the parties, the trial court abused its discretion by failing to sustain appellant's objection to include those assets."

Mr. James asserts that the referee's distribution of marital assets failed to take into account two marital assets held by Mrs. James having a total value of $4,250. Mr. James asserts that the existence and value of the assets were not in dispute, and therefore, they should have been included in the referee's property division. Mr. James is specifically referring to two different types of Kroger stock allegedly in Mrs. James's possession; one type is Kroger K–Plan stock and is valued at $1,950, and the other is regular Kroger stock and is valued at $2,300.

It is axiomatic that a divorce decree is insufficient and incomplete if it does not dispose of all property of a marriage. *Rowe v. Rowe* (1990), 69 Ohio App.3d 607, 613, 591 N.E.2d 716, 719–720.

Based upon our review of the evidence presented at the hearing before the referee, we agree with Mr. James's assertion that the existence and the value of the Kroger K–Plan stock as a marital asset was undisputed at the hearing below. Accordingly, it should have been included as a marital asset in the referee's property division. However, because there was no evidence presented at the hearing to establish that Mrs. James possessed regular Kroger stock, the referee did not err by failing to include it as a marital asset in the division.

Moreover, according to the foregoing principle, if on remand, the evidence establishes, and the factfinder determines, that the Kroger K–Plan stock and the regular Kroger stock existed as marital property, they must be accounted for in the marital property distribution.

"C. Where the referee improperly assesses the monetary value of a party's account, the trial court abused its discretion by failing to sustain appellant's objection to properly assess those funds."

Next, Mr. James asserts that the referee improperly valued the Security Bank account in his possession at $791 rather than $100.

At the hearing, Mr. James established that their Campbell Street property was the subject of an installment contract sale. Further, he testified that the Security Bank account was maintained so that the purchasers of Campbell Street property could deposit their installment payments directly into the account. Mr. James asserted that once the purchasers deposited their payment into the account, he used the money to pay the mortgage on the property.

In both his pretrial statement and his testimony at the hearing, Mr. James represented that the balance of the Security Bank account was $791. However,

on appeal, Mr. James contends that there is no basis for the $791 valuation of the account because there is no evidence to suggest that these transitory funds have any value to him since he immediately withdraws the balance of the account to pay the mortgage. Instead, he asserts that the proper valuation of the account is $100, which is the amount needed to maintain the account and the amount listed in his financial disclosure report. We find no merit in this assertion.

The referee acted within the bounds of his discretion when he assessed the value of the fluctuating account on the date of the hearing and adopted the value presented by Mr. James in both his testimony and his pretrial statement. See *Berish v. Berish* (1982), 69 Ohio St.2d 318, 23 O.O.3d 296, 432 N.E.2d 183.

The proceeds from the sale of the marital property are a marital asset possessed by Mr. James. Regardless of the purpose for which Mr. James uses the proceeds from the installment sale of the Campbell Street property, those proceeds are an asset having value. The mere fact that Mr. James uses the balance of the account to pay the mortgage on the property that is the subject of the installment contract does not render the valuation of the account at $791 an abuse of discretion.

Because the valuation of the Security Bank account adopted by the referee was supported by the evidence of its value presented by Mr. James, the trial court did not abuse its discretion by overruling Mr. James's objection to the valuation.

"D. Where the referee improperly assesses the monetary value of the party's motor vehicles, the trial court abused its discretion by failing to sustain appellant's objection to properly assess those vehicles."

The referee determined that the parties owned four automobiles: a 1985 Oldsmobile, a 1982 Mercury, a 1970 Dodge, and a 1973 AMC Matador. The referee valued the Oldsmobile at $2,500, the Mercury at $1,250, the Dodge at $500, and the Matador at $500. In his division of the marital property, the referee recommended that Mrs. James keep the Matador and that Mr. James keep the other three vehicles. Accordingly, Mrs. James was credited $500 for the value of the Matador, and Mr. James was credited $4,250 for the other three cars.

On appeal, Mr. James asserts two errors regarding the distribution of the cars. We will address each assertion in turn. First, Mr. James asserts that the referee's valuations of the Oldsmobile for $2,500 and the Mercury for $1,250 were not supported by competent, credible evidence, and therefore, should not have been sustained by the trial court.

Only Mr. James offered evidence of the value of the cars. In his pretrial statement, Mr. James listed the value of the Oldsmobile at $2,500 and the Mercury at $1,500. However, at the hearing, Mr. James testified that the

Oldsmobile was worth $2,000 and that the Mercury was worth $500. The referee was not obliged to adopt the second value offered by Mr. James at the hearing. In determining the value for the Oldsmobile, the referee adopted the exact value asserted by Mr. James in his pretrial statement. In determining the value of the Mercury, the referee based the $1,250 value on an estimated figure reconciling the $1,500 value asserted by Mr. James in his pretrial statement and the $500 value asserted by Mr. James in his testimony at the hearing. Accordingly, the values adopted by the referee were supported by competent, credible evidence.

Next, Mr. James asserts that the trial court erred by treating the Matador as marital property and distributing it to Mrs. James because the Matador was Mr. James's inherited, separate property.

 Appellate review of a trial court's classification of property as marital or separate is based on whether the determination is supported by the manifest weight of the evidence. *Roberts v. Roberts* (Feb. 18, 1993), Highland App. No. 92–CA–800, unreported, 1993 WL 49461. When distributing marital property, the trial court must first determine what property is marital and what property is non-marital. R.C. 3105.171(B); *Spychalski v. Spychalski* (1992), 80 Ohio App.3d 10, 15, 608 N.E.2d 802, 805–806. R.C. 3105.171(A)(6)(a) specifically provides that "separate property" includes "an inheritance by one spouse * * * during the course of the marriage." R.C. 3105.171(D) also provides that except as otherwise provided in the statute, the court shall disburse a spouse's separate property to the owning spouse, and if a court does not distribute a spouse's separate property to the owning spouse, the court shall make written findings of fact stating the factors that it considered in making the determination that the spouse's separate property should be distributed otherwise.

 However, based on their actions during the marriage, spouses can transform the nature of the property from separate to marital. *Moore v. Moore* (1992), 83 Ohio App.3d 75, 77, 613 N.E.2d 1097, 1098–1099. In *Moore*, the court determined that the parties had transmuted the two real properties that they previously held as separate property to marital property through their actions of executed deeds granting the other spouse possessory rights to property.

In the present case, Mr. James's uncontroverted testimony establishes that he inherited the 1973 Matador from a grandparent in 1985. Although the referee made no specific factual finding whether the Matador was marital or separate property, by distributing the asset to Mrs. James, the referee treated the car as marital property.

Although it is possible that the car was transmuted from separate property to marital property by the parties' treatment of the vehicle as a marital asset since 1985, no evidence was presented by either party to establish that the parties did

so. The only evidence regarding the treatment of the Matador establishes that Mr. James allowed Mrs. James to use the Matador during their separation period pursuant to an agreed entry by the parties. This evidence standing alone is not enough to support the trial court's determination that the separate property had been transmuted into marital property.

Based on our review of the evidence, we conclude that the trial court's treatment of the Matador as marital property was against the manifest weight of the evidence. Without some evidence in the record to support the conclusion that the parties converted the car inherited by Mr. James into marital property through actions other than simply permitting Mrs. James to use the car during the separation period, the trial court's treatment of the 1973 Matador as a marital asset is not supported by the record.

"E. Where the referee does not equally treat the parties' retirement accounts, the trial court abused its discretion by failing to sustain appellant's objection to properly assess the retirement accounts."

Retirement benefits or the right to receive retirement benefits accumulated during the marriage are marital property which must be equitably distributed in a divorce. *Layne v. Layne* (1992), 83 Ohio App.3d 559, 564, 615 N.E.2d 332, 334–335. As is the case with all marital assets, the trial court has broad discretion in dividing the retirement benefits. However, the Supreme Court of Ohio has suggested that "[i]n order to reach an equitable result, the court should attempt to preserve the pension or retirement asset in order that each party can procure the most benefit, while disentangling the parties' economic partnership so as to create a conclusion and finality to their marriage." *Id.* at 564, 615 N.E.2d at 335, citing *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 559 N.E.2d 1292.

In the present case, Mr. James asserts that the referee treated the parties' retirement plans inequitably and in a way that led to substantial hardship for Mr. James. Specifically, Mr. James asserts that the referee allowed Mrs. James to keep her retirement plan intact and pay Mr. James his share of the plan upon distribution of the benefits, but required Mr. James to liquidate his Star Bank IRA, and thereby sustain substantial tax penalties, in order to pay the distributive award.

After distributing all of the marital assets, the referee required Mr. James to make a distributive award of $6,117 to Mrs. James to account for the "unequal award of various accounts and property," and also to compensate for Mr. James's dissipation of some marital stock proceeds. However, contrary to Mr. James's assertion, the referee did not require Mr. James to liquidate his Star Bank IRA or any of his other assets to make the payment.

Mr. James correctly points out that the uncontroverted evidence supports the conclusion that both parties considered the Star Bank account in his possession to be his retirement money and, therefore, that the referee erroneously determined that he had no retirement benefits. However, regardless of how the account was classified, the referee correctly noted that the account was an IRA in Mr. James's possession. Moreover, the referee's property distribution plan permitted Mr. James to keep all of his IRA accounts and did not require him to liquidate any of them.

The decision to liquidate the Star Bank IRA in lieu of any other assets in his possession in order to pay the distributive award is a choice that Mr. James must make. However, the fact that he may choose to do so does not render the referee's treatment of the parties retirement plans inequitable. Like Mrs. James, Mr. James is free to keep all of his retirement money invested. He can do so by making the distributive award payment with other assets in his possession.

Rather than dividing the IRA accounts in Mr. James possession in half and granting Mrs. James an interest in them, the referee allowed Mr. James to keep all of the IRA accounts free from any claim from Mrs. James. By doing so, the referee properly preserved Mr. James's retirement benefits in such a way that he may procure the most benefit from them.

Based on the foregoing, we conclude that Mr. James's assertion that the referee's treatment of the parties retirement funds was inequitable has no merit. The trial court did not abuse its discretion by adopting the recommended distribution of the Jameses' retirement plans.

"F. Where the referee ignores the wishes of the parties and ignores tax consequences in assessing the distribution of property, the trial court should properly have sustained the appellant's objection to properly assess the Saffron property."

Mr. and Mrs. James owned rental property located at 7132 Saffron Drive in Huber Heights, Ohio. The referee valued the property at $52,000 by adopting the value presented by Mr. James in his pretrial statement and in his testimony at the hearing. The referee also noted that there was a $22,000 mortgage on the property.

At the hearing, Mr. and Mrs. James both expressed a desire to have the Saffron property and the marital residence sold and the proceeds divided between them. Although he had previously indicated a desire to keep both properties, at the hearing Mr. James stated that "[i]f I cannot receive relief for the taxes that will be due next year, which are approximately twelve thousand dollars in capital gains, I would prefer to sell so she would have to pay her one-

half of those taxes." Mr. James also indicated that if he could receive relief for the taxes that he expects to incur, he would like to keep the real properties and buy out Mrs. James's share.

Mr. James testified that the Saffron property was encumbered by a paid option contract for his business partner to purchase the property at a set price. Because of the option contract, to which Mrs. James was not a party, Mr. James testified that he would be required to sell the property in 1992. Because he would be forced to sell the property, Mr. James estimated that he will incur $12,000 in capital gains taxes.

Rather than ordering the sale of the properties or prescribing a buy-out agreement between the spouses, the referee distributed the marital residence to Mrs. James and the Saffron property to Mr. James. However, the referee did not account for any prospective tax consequences of the distribution of the Saffron property when crediting the parties for the distribution of their respective properties.

Mr. James asserts that the referee improperly ignored the expressed wishes of the parties to sell the properties by distributing the Saffron property to him and the marital residence to Mrs. James. Additionally, he asserts that by distributing the Saffron property to him without reducing its value by the estimated amount of taxes that he will incur, the referee improperly failed to consider the prospective tax consequences of the distribution. We disagree with both assertions.

Among the factors that the court must consider when distributing marital property is "[a]ny division or disbursement of property made in a separation agreement that was voluntarily entered into by the spouses." R.C. 3105.171(F)(8). However, in the present case, the parties submitted the property distribution issue to the court because they could not reach an agreement regarding how the real property and the other property of the marriage were to be divided. By submitting the issue to the court, the parties empowered the court to divide the property equitably.

The court has broad discretion in determining an equitable property distribution. The court is free to consider the various distribution methods suggested by the parties, however, the court is not bound by them. As long as the distribution ordered by the court is not unreasonable, arbitrary, or unconscionable, the court acts within its discretion in fashioning an award. In the present case, it was not unreasonable for the referee to distribute the marital residence to Mrs. James and the Saffron property to Mr. James, rather than ordering the sale of both of the properties.

■ Furthermore, based on the evidence presented at the hearing, it was not an abuse of discretion for the referee to decline to reduce the value of the Saffron property by the amount of taxes that Mr. James estimated he would incur.

R.C. 3105.171(F)(6) requires that when making a division of marital property the court must consider "[t]he tax consequences of the property division upon the respective awards to be made to each spouse." However, Ohio courts have determined that a court need not consider tax consequences that are speculative. *Day v. Day* (1988), 40 Ohio App.3d 155, 159, 532 N.E.2d 201, 205–206; *Frost v. Frost* (1992), 84 Ohio App.3d 699, 618 N.E.2d 198.

Although Mr. James asserted that the Saffron property was the subject of an option contract, he failed to establish the likelihood that the option would be exercised. He asserted that he was likely to incur $12,000 in capital gains taxes, but he failed to present any evidence of the basis for determining the amount of capital gain that he would realize as a result of a sale. Based on the evidence presented at the hearing before the referee, the alleged prospective tax consequences of the distribution of the Saffron property were speculative. Accordingly, we cannot say that the referee acted unreasonably, arbitrarily, or unconscionably by declining to reduce the value of the Saffron property by the estimated amount of capital gains tax that Mr. James alleged he would incur.

However, on remand, upon a showing of proper proof of the likelihood that the option will be exercised and of the amount of capital gains that are likely to be realized, the tax consequences of the distribution of the Saffron property are a factor that must be considered when dividing and valuing the asset.

"G. Where the referee incorrectly assesses the entire value of the appellant's sale of Philadelphia Electric stock, the trial court should properly have sustained appellant's objection to properly assess the sale of the stock."

■ Mr. James argues that the court erred in holding him accountable for dissipating the full amount received from the sale of the Philadelphia Electric stock. Mr. James admits that he sold the marital stock for $2,400 and that he spent the proceeds of the sale. However, he contends that he used part of the proceeds of the sale to pay marital debts, and therefore, he should not be responsible for dissipating the entire amount.

On cross-examination, the following colloquy regarding the proceed from the sale of the Philadelphia Electric stock took place between Mr. James and Mr. Carretta:

"Q. Okay. And what were those things—what was that spent for, do you know?

"A. Taxes, car insurance, car repairs, lawyer fees, legal fees pertaining to audits of the business, and so on and so forth. I can't sit here and tell you what they all are. I've itemized part of 'em—part of 'em for you in the past and submitted them."

Contrary to Mr. James's statement that he previously itemized the expenditures and "submitted them," a review of the record indicates that there was no accounting before the referee to establish how the proceeds were spent. Although Mr. James testified that he used the funds, in part, for marital debts, he freely admits that he used at least part of the money for the nonmarital expenses of his attorney fees and the cost of litigating the present case.

As the trier of fact, it was the referee's job to determine the credibility of Mr. James's testimony regarding how the proceeds were spent. In the absence of an accounting to substantiate his testimony, we cannot say that the referee erred by discounting Mr. James's testimony. Furthermore, even if the referee was inclined to credit Mr. James's testimony that he used part of proceeds for marital debts, Mr. James failed to provide any evidence that would have enabled the referee to determine what portion of the funds were used for marital debt.

Based on the foregoing, it was not unreasonable, unconscionable, or arbitrary for the trial court to charge Mr. James with having dissipated the full amount of the proceeds of the sale of the Philadelphia Electric stock.

V

Mr. James's First Assignment of Error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

BROGAN, P.J., and FREDERICK N. YOUNG, J., concur.