Appellant John B. Drzal claims Domestic Relations Court Judge Christine T. McMonagle erred in determining the division of assets and liabilities set forth in the April 21, 1998 judgment of divorce. We disagree and affirm.
The parties married on September 30, 1967 and three children were born of the union: John, born May 5, 1972; Michael, born November 3, 1976; and Carolyn, born December 24, 1981. They jointly owned the marital home, purchased in 1967, and commercial property, purchased in 1976, which houses Drzal's business, Accurate Printing Service.
During the early years of the marriage, Drzal worked for others in the printing industry and did outside or independent work earning additional income which he admittedly did not declare on his income tax returns. In 1972, he purchased a printing business and operated it as a sole proprietorship.
One month after her high school graduation in 1966, appellee Elizabeth Drzal became employed by Ohio Bell and resigned in 1972, a few months before the birth of the parties' first child. She had no other outside employment until April 1996, when she was hired as a receptionist in the service department of Real Estate Title Services Corp.
Drzal left the marital home in April 1994, told Ms. Drzal he no longer wanted to continue the marriage, and suggested she attend school and learn a skill to support herself. He moved to the second floor of the commercial property on Lorain Avenue, directly above his printing business. Ms. Drzal remained with her three children in the marital home on Forestview Circle in Brook Park. Drzal continued to pay for all property taxes and insurance for the home, auto, and hospitalization and, additionally, provided payments by check directly to Ms. Drzal. He deducted these costs as business expenses and attributed the payments to Ms. Drzal as wages.
In February and April of 1994, shortly before he left the martial home, Drzal withdrew the full balance of the couple's joint savings account, $33,490.30. He claimed a February 1994 withdrawal of $8,000 was used to pay various taxes associated with his business and the April withdrawal was spent remodeling the second floor of the commercial property into a two-bedroom apartment for his residence. He claimed it cost approximately $40,000 for the remodeling and he had to borrow $8,000 on his Mastercard to finish the repairs. He also admitted using some of the $12,923 from his IRA to pay for the property upgrade and repairs.
To cover various expenses in 1995, Ms. Drzal cashed almost $25,000 worth of savings bonds purchased during the marriage. In early 1997, Drzal ceased any support for Ms. Drzal. Ms. Drzal filed a complaint for divorce claiming incompatibility on April 18, 1997, and Drzal agreed this was true, making grounds for the divorce not an issue.
The assets and liabilities of the couple were disclosed at hearings before the judge on March 4, 5 and 13, 1998. Ms. Drzal had an IRA through National City Bank with a value of $8,358.06, representing an increase without contributions to the $6,968.62 on deposit in April 1994. She also held a 401k account with Key Corp. valued at $615.09 in addition to stock, in her maiden name, in various "Baby Bell" communications companies, all proceeds from the ATT break up. The parties stipulated to the number of shares and the aggregate value of $9,040.85. She testified she earned $17,500 per year as a receptionist/clerk.
Ms. Drzal's real estate expert, a certified residential property appraiser, estimated the value of the marital home at $97,500, after having made a $15,000 adjustment for needed repairs including a fifteen-year-old roof. He took issue with the accuracy of Drzal's expert's opinion, which placed the value at $115,000, noting that the expert was not certified by any professional real estate organization for such appraisals. Ms. Drzal also took issue with that opinion, pointing to various inaccuracies. First, she noted that Drzal's expert had called her one week before trial, asking permission to do a walk-through inspection of the marital home, although he had released his report on the home's value one month earlier. His report indicated that the home had a dishwasher and a newer furnace but, Ms. Drzal testified, the dishwasher was purchased in 1977 and did not work and that the furnace was installed in 1979. She noted that the property had not been improved since some time before April 1994, except for minor repair of the flashing on the roof. Drzal, however, disagreed with both valuations, believing the marital home to be worth at least $130,000 based upon the sale price of a neighbor's property four years earlier.
With regard to the commercial property, Drzal testified that the assessed value was $79,490. Ms. Drzal believed that the property had a value of $85,000 based upon a letter from the county auditor's office that indicated that the assessed value should be increased to that amount.
The parties owned two motor vehicles: a 1989 Chevrolet Cavalier driven by Ms. Drzal, appraised at $700, and a 1990 Astro pick up truck driven by Drzal, which he valued at $1,000.
The parties also had four Prudential Life Insurance policies. Two policies listed Drzal as the owner and Ms. Drzal as the beneficiary: the first had a face value of $100,000 and a cash surrender value of $18,428.24; the second had a face value of $5,000 and a cash surrender value of $214.87. The two remaining policies listed Ms. Drzal as the owner and Drzal as the beneficiary: the first had a face value of $3,000 and a cash surrender value of $1,164.97; the second had a face value of $25,000 and a cash surrender value of $3,591.52.
On the matter of marital debt, the parties agreed that the April 1994 Mastercard balance was $1,301.[1] In 1995 and 1996, Ms. Drzal borrowed $5,200 from her mother for tuition and expenses at Polaris Career Center and an additional $5,000 in November 1997 to cover expenses. She remained indebted to her mother for $10,200.
Drzal testified that, as of the date of hearing, he owed almost $84,000 for loans incurred after April 1994. He incurred this debt through loans to pay back taxes and penalties for his business and to improve the commercial property. In 1994, he borrowed $20,000 from his father to pay off the parties' 1993 tax liability of $13,718. He also took out a $6,112.66 furniture loan in 1994, but he believed that the furniture was now worthless. He claimed current monthly personal expenses of $3,800, which included loan payments. He further claimed he wanted to consolidate and pay off this debt through a lower interest rate loan by mortgaging the property but Ms. Drzal would not agree.
Drzal's certified public accountant, Clell R. McIntosh, had done accounting for Accurate Printing over a period of twelve years. The cover letter on the various financial statements advised that McIntosh had not audited the company and did not verify its account and cash assets or determine whether the company owned certain equipment. McIntosh admitted that he relied solely on the information given to him by Drzal when compiling the statements.
McIntosh said that in 1993, the tax return showed gross receipts of $310,918, and taxes due of $13,718. Drzal testified that his gross income for 1993 was $74,242.
McIntosh stated that in 1994, the receipts totaled $248,000, but the company showed no profit; rather, it lost $12,000. Drzal testified that in that year Accurate Printing paid $20,000 to Ms. Drzal, characterized as wages, and tax deductions were taken for depreciation and repairs.
McIntosh's records also showed that the company had sales of $139,000 and a profit of $10,900 in 1995. Drzal testified that $16,400 was paid as wages to Ms. Drzal.
For 1996, McIntosh indicated that the company showed sales of $170,000 and losses of $6,548. In that year Ms. Drzal received $13,400 as wages with depreciation also deducted from the tax return.
Finally, for 1997, the company showed sales of $156,000 and a profit of $976. Up through April of that year, Ms. Drzal received about $2,800 as wages.
McIntosh also indicated that the net equity of the business, as of December 31, 1997, was a negative $12,943. In 1996, the company's net equity was a negative $3,052. The year 1995 showed a net equity of $16,365, and 1994 showed a net equity of $20,576.
McIntosh also indicated that the original cost of the assets of the business, including the building and land, equaled $171,158.87 but after depreciation the assets were valued at only $20,191. He agreed if the building was also partially used as a personal residence, the vehicle for personal errands, and the furniture for personal use, then depreciating the entire amount from the business would not be proper.
As of December 31, 1997, long-term liabilities of Accurate Printing equaled $45,882. Long-term liabilities equaled $18,516 in 1996, $11,000 in 1995, and $4,870 in 1994. According to McIntosh, these liabilities did not include Drzal's personal debt of approximately $39,000.
McIntosh noted that any amounts paid to Drzal were recorded as a "draw" and were not deducted as an expense of the business. A draw, he explained, was not the same as income. Drzal stated that for the years 1991, 1992 and 1993, his draw totaled $87,850. He claimed he paid living expenses, such as life, auto, home, and business insurance, out of the business accounts and those costs were not reflected in the draw. In the years preceding 1994, he claimed he gave Ms. Drzal a company check which she used for food and other household expenses. Any money remaining was to be deposited into the parties' joint savings account and to purchase U.S. Savings Bonds.
There was no documentary evidence to show the amount of Drzal's draw for the years 1994, 1995, and 1996. He claimed he used it to pay for insurance on the home and the business and his living expenses. He claimed his draw in 1997 totaled $25,000.
Drzal began the practice of sending Ms. Drzal a company check from Accurate Printing in the form of "wages" in June 1994. She, however, was unaware that the $317 weekly checks were considered wages. He admitted that she had never worked for the company, but he gave her a W-2 or 1099 so she would have the benefit of social security coverage. McIntosh stated the practice of issuing paychecks to a non-employee was an improper business expense, and issuing a W-2 or 1099 was not a proper accounting practice. McIntosh conceded that if the wage expense was not as high as reported, the profits of the company would have increased. He also claimed that, even if the money was reported as profit and not wages, it would have made no difference in determining income on their joint tax return.
While Drzal claimed he paid Ms. Drzal $20,000 in 1994 and $16,400 in 1995, Ms. Drzal testified that she received only $317 per week as of June 1994 and that was reduced to $255 per week in 1995 after their son, Michael, went to live with his father. The joint tax returns, during this time, were not endorsed by Ms. Drzal but by the company secretary who forged Ms. Drzal's name.
Drzal testified his best year for business was 1993 but, with the advent of electronic stripping and desktop publishing, the typesetting business became obsolete and "the bottom caved in." He laid off all of his employees except one, his brother-in-law, who receives a yearly salary of $36,000. He claimed that he could no longer borrow money to buy new equipment and, while the current printing equipment had a market value of $53,750, it only had a liquidation appraisal value of $26,500.
He testified that Accurate Printing had two bank accounts (one for checking and the other for savings), but did not produce records for the savings account, which he claimed was used for the deposit of withholding taxes. He also did not produce any canceled checks from his personal checking account.
In her judgment entry nunc pro tunc, the judge fixed the duration of the marriage between September 30, 1967 to April 30, 1994. She also determined the following:
 In 1993, the year before the separation, his wage was $81,426.00 (Plaintiff's Exhibit 4) on gross sales of $310,915.00. In 1995, his income was $31,716.00 with gross sales of $193,621.00[.] In 1996, his tax return shows no wage whatsoever on gross sales of $170,964.00. However, the Defendant does engage in rather "creative" accounting methods. All his expenses are paid from his Accurate Printing account. When he gave money to the Plaintiff during the separation, he deducted it as "wage" on his books and W-2'd the amounts to her as an employee wage expense. He further testified that when he had needs like food or clothing, he wrote himself a check on Accurate Printing, called this check his "draw" and testified "draw was not income." From 1994 through 1997, he borrowed heavily. In June of 1997, his installment payment obligation was $1,754.81 per month (see Defendant's pretrial statement). There was no testimony that any of this debt is in default.
 The Court finds that all of the debt is business related. Husband's basic expenses, save installment debt as outlined on his pretrial statement are $2,040.00 per month, or $24,480.00 per year. Hence, the Magistrate's imputation is, if anything conservative and the Court is constrained, in light of Defendant's bookkeeping practices, to utilize this figure for husband's income.
* * *
 While the "crash" of husband's company curiously coincides with the separation of the parties, the Court found credible Defendant's explanation therefor: the personal computer boom with desktop publishing programs has all but rendered obsolete his printing company, his skills are not transferrable and without reeducation and/or retraining it is unlikely that he will duplicate his 1993 income levels.
The judge also found that the parties had a net worth of $295,880.00, taking into account the marital debt at separation of $1,301 for the charge card balance and $13,718 for the 1993 IRS debt paid by Drzal. The judge then divided the property as follows:
 To Wife
(J) House on Forestview $97,500.00
(W) Prudential policy #45341579 1,165.00
(W) Prudential policy #D75784114 3,592.00
(W) IRA 6,951.00
(W) Savings bonds (cashed in and spent) 25,132.00
(H) Prudential policy #75784110 18,429.00
TOTAL $152,769.00
To Husband
(J) Building on Lorain Road $85,000.00
(H) Prudential policy #D85015317 215.00
(H) IRA (cashed in) 12,925.00
(H) NCB savings taken by husband 33,490.00
(H) Business equipment 26,500.00
(H) Marital debt at separation (1,301.00)
(H) IRS debt paid by husband (13,718.00)
TOTAL $143,111.00
The judge "selected the liquidation value of the business equipment rather than the fair market value of the business equipment because of the likelihood of liquidation." She concluded that, while the division of property was "not precisely equal," it was "equitable under the facts of this case."
With regard to non-marital assets and liabilities, the judge held that Ms. Drzal sustained her burden of proof that the "Baby Bell" stock was purchased before she entered the marriage and separate property. The parties retained the vehicles in their possession and the debt incurred during the period of separation, beginning in April 1994, would be allocated to the party who had incurred it. Ms. Drzal retained her obligation to pay her $10,200 debt to her mother and minimal credit card debts while Drzal retained his obligation for almost $84,000 in unsecured debt.
Drzal claims four assignments of error
 I. TRIAL COURT ERRED BY IMPUTING INCOME TO DEFENDANT NEARLY DOUBLE HIS AVERAGE INCOME DURING THE LAST FOUR YEARS OF THE MARRIAGE.
Drzal submits error in imputing income to him based upon his expenses. Because draw is not income, he argues, the judge erred when she simply accepted this expense figure despite evidence showing his company made very little profit, if any.
Ms. Drzal counters that, because Drzal took money from the company whenever he needed it, and there was no showing that his debts were in arrears, the court properly imputed to him a yearly salary of $24,480 based upon his pretrial statement.
This court first notes that the judge specifically did not require Drzal to pay Ms. Drzal any spousal support, although the judge retained jurisdiction to do so. He has not argued that a disparity in incomes and assets requires Ms. Drzal to pay spousal support to him, nor has he challenged the amount of child support. Contrary to the requirements of App.R. 16(A)(7) and Loc. App.R. 6(6), he cites no authority to support this assignment of error, nor does he articulate how imputing to him an income of $24,480 per year prejudiced his rights.[2] As such, this court declines to address the question of whether the judge erred by imputing a yearly income of $24,480 to Drzal.
 II. THE TRIAL COURT ERRED BY FINDING THAT THE MARRIAGE TERMINATED ON APRIL 30, 1994 THUS CREATING CONFLICTING DATES FOR THE VALUATION OF ASSETS AND OBLIGATIONS.
 III. THE TRIAL COURT ERRED BY CONCLUDING THAT DEBTS INCURRED BY DEFENDANT WERE UNREASONABLE AND THEREFORE NOT MARITAL OBLIGATIONS.
 IV. THE TRIAL COURT ERRED BY IMPROPERLY ANALYZING THE FINANCIAL STATEMENTS OF THE BUSINESS OWNED BY DEFENDANT.
Drzal argues error in finding that the marriage ended April 30, 1994, when he left the marital home, rather than the date of final hearing in March of 1998. He claims that, after leaving the home, he continued to pay expenses for the residence and provide support for the family. Even the two marital assets, the home and the commercial property, remained in both party's name. He contends that had the marriage ended on April 30, 1994, then the judge should have valued all marital assets at that time — not just the IRAs, bank accounts and bonds. By the judge selecting April 30, 1994 as the date of termination of the marriage and valuing a part of the assets as of the date of trial, Drzel argues, prejudicial error occurred.
He also argues error in concluding that all of the debt owed at the time of the divorce, either by himself or Accurate Printing Service, was not subject to consideration in the analysis of the marital assets. He contends that merely because his decision to incur debt may have been unwise, as the judge believed, it was not enough to declare the debt as "non-marital." In any event, he claims that he incurred the debt to upgrade the real estate, something which both acknowledged was a marital asset, and to pay tax obligations, another marital debt.
Finally, he argues that nothing in the record supports the charge that the financial statements prepared by his certified public accountant were the product of "rather creative accounting." He contends the judge abused her discretion by simply ignoring the documentary evidence prepared by his expert and using her own methods to attribute improper and higher values to the assets. "By picking, choosing, and ignoring facts," he argues, the judge improperly valued $23,000 in assets as $143,110, all to the prejudice of his rights.
Ms. Drzal points out that, contrary to Drzal's assertions, the evidence showed, at best, he used creative accounting methods and, at worst, he defrauded the government. Further, the judge properly concluded that April 30, 1994 should be the proper date of separation since the evidence showed the parties had divided assets and accounts at the time of the separation. Moreover, each party occupied separate residences. Because the assets were divided at that time, the judge correctly concluded that Drzal's debt should not be considered marital debt. Moreover, she argues, the evidence also showed that he undertook the debt himself and for his own benefit.
Section 3105.171(B) requires a judge to determine what constitutes marital property and what constitutes separate property. Marital property includes, inter alia, real and personal property acquired by either or both of the spouses during the marriage. R.C. 3105.171(A)(3). "During the marriage" is defined as "the period of time from the date of the marriage through the date of the final hearing * * *" or, if the judge determines that using either of these dates would be inequitable, "the period of time between those dates selected and specified by the court." R.C. 3105.171(A)(2). After determining what constitutes marital property acquired during the marriage, the judge must divide the property equally or, if an equal division would be inequitable, in a manner determined to be equitable. R.C. 3105.171(C); see, also, Zeefe v. Zeefe (1998), 125 Ohio App.3d 600,609, 709 N.E.2d 208.
In order to determine what would constitute an equitable division of property, the judge should first determine the value of the marital assets. Allen v. Allen (1996), 109 Ohio App.3d 640,642, 672 N.E.2d 1056; Strong v. Strong (Nov. 25, 1988) Cuyahoga App. No. 73670. A judge has broad discretion when determining the value of a marital asset and is not required to use a particular method of valuation. James v. James (1995),101 Ohio App.3d 668, 681, 656 N.E.2d 399. The task of a reviewing court is to determine whether there was an abuse of discretion in arriving at a particular valuation. James,101 Ohio App.3d at 681. An abuse of discretion connotes more than an error of law or of judgment: it implies that the judge held an unreasonable, arbitrary, or unconscionable attitude. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.
"A trial court may rely in whole or in part on an expert's opinion when setting a value upon marital property." Strong,supra. Any objection to the valuation used by a judge would go to the weight of the evidence. See id. When it considers the weight and credibility of the evidence, a reviewing court must determine whether the judgment is supported by some competent, credible evidence that goes to support all the essential elements of the case. Id. Credibility of witnesses and the weight given to evidence are matters to be determined by the trier of fact.Simoni v. Simoni (1995), 102 Ohio App.3d 628, 634, 657 N.E.2d 800
appeal not allowed (1995), 73 Ohio St.3d 1453. This court will not substitute its judgment for that of the judge on matters of credibility.
Drzal argues that had the commercial property been valued at $79,240 rather than $85,000 and that sum added to the $26,500 value of the business equipment and the $12,943.08 negative equity of the business, his assets would have been properly valued. He claims the assets awarded to him are overvalued by $33,134.62.
The arguments contesting the valuation of the properties all go to the weight of the evidence submitted through the testimony of Drzal and McIntosh. McIntosh's financial reports were based solely upon the information given to him by Drzal which then resulted in the focus being directed toward Drzal's credibility.
The evidence showed that Drzal did not pay federal or state taxes on outside income during the first few years of his marriage; that his secretary rather than his wife signed their joint tax returns; and that he paid Ms. Drzal "wages" as an employee although she did no work for Accurate Printing. He admitted that he did not produce records of either the company savings account or his personal checking account for inspection by opposing counsel. He apparently attributed the expenses of automobile insurance and residential home insurance as business expenses and may have taken improper depreciation deductions for the commercial property, the truck, and the furniture he purchased for his second-floor apartment.
A judge is free to disregard or accept opinion testimony about the value of any property because the credibility of the evidence is what is being examined. This court will not substitute its judgment for that of Judge McMonagle. She did not abuse her discretion in discounting evidence of the negative value of the business or in finding the value of the commercial property to be $85,000. James, 101 Ohio App.3d at 681.
Drzal further claims that the almost $84,000 in debt incurred after April 1994 is marital debt and the judge abused her discretion in finding the duration of the marriage to extend from September 30, 1967 to only August 30, 1994 and allocating all debt incurred after that date to him. While this court might agree with a claim that his unilateral decision to terminate the marriage in April 1994 does not constitute, in and of itself, ade facto termination of the marriage for property division purposes, we would be more persuaded if the assertion was submitted with clean hands.
"We know what a person thinks not when he tells us what he thinks, but by his actions."[3] It is clear from the facts that Drzal intended to end his marriage when he left the marital home in April of 1994. First, he surreptitiously withdrew $33,490 from the parties' joint savings account and cashed in an IRA worth $12,925. Next he told his then wife that he no longer wanted to continue in the marriage and suggested that she go back to school to learn a skill to support herself. Then he took up residence at the commercial property and began renovating it, apparently claiming the property as his own. He left Ms. Drzal with the marital home, $25,132 in savings bonds, $6,951 in her own IRA, and a nominal amount in a checking account. The paramount purpose of R.C. 3104.171 is to ensure an equitable property division: "Neither party should earn a profit at the expense of the other."Cherry v. Cherry (1981), 66 Ohio St.2d 348, 355, 421 N.E.2d 1293.
In this case, Drzal presented questionable testimony and evidence on the value of the properties, his income (or lack thereof), his business, and the amount of his debt. He included in the $84,000 figure the amount he paid to renovate the second-floor of the commercial property into a two-bedroom apartment. This amount varies: while he testified that it cost him over $43,000 for improvements, his appellate brief indicates that the cost was $37,576. The brief allocates another $29,000 to the business, $6,112.66 for furniture, and $13,718 for back taxes. It is apparent that he incurred this debt, unlike the tax debt,[4] solely for his own benefit or the benefit of Accurate Printing. Moreover, since he retained his business and the commercial property as part of the judgment, he also retained the benefit of these loans. Allocating a portion of this debt to Ms. Drzal, as allocating a portion of her debt to him, would have been inequitable under the facts of this case.
Based upon this record, the judge did not abuse her discretion when she concluded that the duration of the marriage extended from September 30, 1967 to April 30, 1994.
Drzal also argues that the judge should have valued everything by the April 1994 separation date — not just bits and pieces of the marital property. Such a contention is without merit. He stipulated to the 1994 values adopted by the judge and failed to put forth any evidence of an April 1994 value of those assets for which the judge then adopted a value as of the hearing date. Because there was no evidence to support any other valuation, the judge properly accepted the April 1994 values as stipulated and the hearing date values as submitted into evidence. Berish v.Berish (1982), 69 Ohio St.2d 318, 432 N.E.2d 183.
Based upon the foregoing, the judge did not abuse her discretion when she determined April 30, 1994, to be the date of separation for application of R.C. 3105.171, that March 3, 1998, was the valuation date for certain marital assets, and allocated to Drzal the debt of the loans incurred by him after April 1994.
Judgment affirmed.
It is ordered that appellee recover from appellant her costs herein taxed.
This court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Division of Domestic Relations, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
DIANE KARPINSKI, P.J. CONCUR; MICHAEL J. CORRIGAN, J.,CONCURS IN JUDGMENT ONLY.
 _________________________________ JUDGE ANNE L. KILBANE
[1] Apparently, the mortgages on the real estate had not fully been paid off in April 1994, but the amount remaining on the balance was not clear from the transcript, and Drzal has not included the documentary evidence admitted at trial with the record. In any event, the judge accepted the marital debt as $1,301.
[2] The judge could have imputed to Drzal a yearly salary of $45,600 based solely upon his own testimony. He stated that his monthly expenses equaled $3,800 and that he withdrew money from the business to cover those expenses. As Ms. Drzal pointed out, there was nothing to show that his loans or other obligations were in arrears.
[3] lsaac Bashevis Singer (1904-1998).
[4] Contrary to his calculations, the judge considered the sum of $13,718 in their 1993 tax debt as martial debt and allocated it accordingly.