[Cite as *Tate v. Tate*, 2018-Ohio-1244.]

COURT OF APPEALS
HOLMES COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| ROBYN M. TATE | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| BRUCE E. TATE | : | Case No. 17CA004 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Court of Common Pleas, Domestic Relations Division, Case No. 15DR019


JUDGMENT:     Affirmed/Reversed in Part; Judgment Entered


DATE OF JUDGMENT:     March 29, 2018


APPEARANCES:

For Plaintiff-Appellee

LON R. VINION
3431 Commerce Parkway
Suite C
Wooster, OH 44691

R.J. Helmuth
343 South Crownhill Road
P.O. Box 149
Orrville, OH 44667

For Defendant-Appellant

JAMES M. RICHARD
127 East Liberty Street, Suite 100
P.O. Box 1207
Wooster, OH 44691

ALETHA M. CARVER
4775 Munson Street, NW
P.O. Box 36963
Canton, OH 44735-6963

*Wise, Earle, J.*

{¶ 1}   Defendant-Appellant, Bruce E. Tate, appeals the March 30, 2017 decree of divorce of the Court of Common Pleas of Holmes County, Ohio, Domestic Relations Division. Plaintiff-Appellee is Robyn M. Tate.

### FACTS AND PROCEDURAL HISTORY

{¶ 2}   On February 14, 1998, appellant and appellee were married.  No children were born as issue of the marriage.

{¶ 3}   In 1997, prior to the parties' marriage, appellant, together with his brother, Russell Tate, and his parents, Harold (Hal) and Nancee Tate, formed Tate Farms Company, Ltd.  Appellant received a 4 percent ownership interest in the company.  By 2007, appellant had a total ownership interest of 24.5 percent.  Each time appellant's ownership interest increased, he signed a demand note in an amount equal to the agreed upon value of his interest.  The demand notes accrued interest at 4 percent.

{¶ 4}   In 2004, the same parties entered into a written partnership agreement. Appellant received a 25 percent ownership interest and was required to sign a demand note equal to 25 percent of the agreed upon value of the partnership assets or $257,000.

{¶ 5}   No payments were ever made on the demand notes.

{¶ 6}   The partnership is the operating company for Tate Farms.  It owns all of the farm equipment and assets.  The company is the holding company, holding title to all of the real estate.  In order to purchase additional real estate, the partnership maintained a line of credit and transferred monies to the company to make the purchases and/or pay loan obligations.

{¶ 7}   The agreements between appellant and his family members regarding the farms included buy-sell provisions in the event a partner wanted out.  The buyout value for the partnership interest excluded the grain inventory (corn, soybeans, hay, straw) because the grain inventory was used to cover the operating expenses for the coming year.  The buyout value for the company interest was based on historical land values.

{¶ 8}   Appellant owned a farm he had acquired prior to the marriage, referred to as the SR 39 farm.

{¶ 9}   During the course of the marriage, appellant worked on the family farm and appellee worked outside the home/farm.

{¶ 10} On March 10, 2015, appellee filed a complaint for divorce against appellant, and also named defendants, Tate Farms Company, Ltd. and Tate Farms, a Partnership, the two entities appellant was involved in.

{¶ 11} Hearings were held on September 19, 21, 22, 23, 29, and October 10, 2016.  At the conclusion of the September 29, 2016 case, the Tate Farms defendants moved for a directed verdict.  By judgment entry filed October 11, 2016, the trial court granted the motion and dismissed them from the case.

{¶ 12} On February 13, 2017, the trial court issued a statement of the case, findings of fact, and conclusions of law.  The trial court referred to attached Exhibits A, B, and C which were not attached.  On March 30, 2017, the trial court issued a decree of divorce, attaching Exhibits A and B, but not C.[1]  The trial court ordered appellant to pay appellee $1,479,542.57 to effectuate an equitable distribution, and ordered

---

[1]We note the decree did not specifically reference Exhibit C, although it did adopt and incorporate the February 13, 2017 filing which did.

appellant to pay appellee spousal support in the amount of $1,000 per month for seventy-two months.

{¶ 13} Appellant filed a notice of appeal on April 4, 2017.

{¶ 14} On April 25, 2017, appellant filed with the trial court a motion for a nunc pro tunc order to address the missing Exhibit C. The trial court did not rule on this motion.

{¶ 15} On May 15, 2017, appellant filed with this court a motion to correct the record under App.R. 9(E), seeking a limited remand to address the missing exhibit. By judgment entry filed June 8, 2017, this court granted the motion and remanded the matter to the trial court to address the missing exhibit. On June 26, 2017, the trial court filed a nunc pro tunc statement of the case, findings of fact, conclusions of law, and decision, attaching the missing Exhibit C. The trial court made substantive changes to its previous decision which is the subject of separate appeals (App. Nos. 17CA13 and 17CA14).

{¶ 16} This matter is now before this court for consideration of the trial court's decree filed March 30, 2017, based on the findings of fact and conclusions of law filed February 13, 2017, with the added Exhibit C. The pertinent parts of the decision and any additional relevant facts will be addressed under each of the corresponding assignments of error. Assignments of error are as follows:

I

{¶ 17} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT UTILIZED THE 'FAIR VALUE' STANDARD OF VALUE TO DETERMINE THE VALUE OF APPELLANT'S INTEREST IN TATE FARMS, WHICH RESULTED IN AN

UNEQUAL AND INEQUITABLE DIVISION OF PROPERTY IN VIOLATION OF R.C. 3105.171(C)."

II

{¶ 18} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO ENFORCE THE CURRENT UNCONTROVERTED BUY-SELL AGREEMENTS THAT APPELLANT ENTERED INTO WITH TATE FARMS."

III

{¶ 19} "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO CONSIDER THE TAX CONSEQUENCES OF FORCING APPELLANT TO PAY THE AWARD OF $1,479,542.57 AND IMPOSING A HOLD HARMLESS PROVISION."

IV

{¶ 20} "THE TRIAL COURT'S DECISION FINDING THAT APPELLANT COMMITTED FINANCIAL MISCONDUCT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

V

{¶ 21} "THE TRIAL COURT ABUSED ITS DISCRETION BY AWARDING ROBYN SPOUSAL SUPPORT AT A RATE OF $1,000.00 PER MONTH FOR FIVE (SIC) YEARS."

VI

{¶ 22} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT IMPOSED AN INTEREST RATE OF 7% PER ANNUM."

I, II

{¶ 23} In his first assignment of error, appellant claims the trial court erred in utilizing the "fair value" standard to determine the value of his interests in the Tate Farms entities, resulting in an unequal and inequitable division of property in violation of R.C. 3105.171(C). In his second assignment of error, appellant claims the trial court abused its discretion in refusing to enforce the buy-sell agreements that he had entered into with the Tate Farms entities to determine his interest in the farms. We disagree with both assertions.

{¶ 24} Appellant is not contesting the trial court's designation of marital property. In order to make an equal or equitable division of marital property pursuant to R.C. 3105.171(C)(1), a trial court must first determine the value of the property. A determination on valuation rests in a trial court's broad discretion. *Berish v. Berish,* 69 Ohio St.2d 318, 432 N.E.2d 183 (1982). In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 25} In order to establish value, appellant presented the expert testimony of Cathy Roche, and appellee presented the expert testimony of John Cook, both certified professional accountants. Ms. Roche utilized three different methodologies: 1) net asset value method (asset approach); 2) capitalized excess earnings method (income approach); and 3) guideline company method (market approach). Defendant's Exhibit 13. Mr. Cook utilized two different methodologies: 1) fair value; and 2) fair market value. Plaintiff's Exhibit KK. The trial court also had a collective report prepared by Jon

Mast, a real estate broker and auctioneer, and Steve Andrews and Andrew White, relators and auctioneers, (hereinafter known as the "Mast" report).[2]  Plaintiff's Exhibit LL.  Lastly, the trial court had the financial statements from the Tate Farms entities. Plaintiff's Exhibits DD and FF; Defendant's Exhibits 21 and 22.   Via a motion in limine, appellant sought to exclude Mr. Cook's valuation under the "fair value" standard, arguing the standard is only used in the state of New Jersey and is not applicable in Ohio.  The trial court took the matter under advisement and ultimately denied the motion by judgment entry filed October 11, 2017.

{¶ 26} Appellant now argues this court must review the trial court's use of the "fair value" standard under a de novo standard of review because the trial court's evidentiary ruling on the motion in limine was "based on an erroneous standard or a misconstruction of the law."  Appellant's Brief at 10, citing *Wray v. Wessell,* 4th Dist. Scioto Nos. 15CA3724 and 15A3725, 2016-Ohio-8584, ¶ 13.  We disagree.  As explained by this court in *Brown v. Brown,* 5th Dist. Licking No. 2008 CA 0111, 2009-Ohio-4913, ¶ 32:

R.C. 3105.171, which governs property distribution, sets forth no

specific manner for the trial court to determine valuation of property.  *Crim*

*v. Crim,* Tuscarawas App. No. 2007AP060032, 2008-Ohio-5367, ¶ 36,

citing *Focke v. Focke* (1992), 83 Ohio App.3d 552, 555, 615 N.E.2d 327.

---

[2]In her appellate brief at 10, appellee erroneously referred to these individuals as "independent expert appraisers, consisting of three real estate appraisers."  Her brief also erroneously referred to the report as an "appraisal."  To be clear, Mr. Mast, Mr. Andrews, and Mr. White are not certified professional real estate appraisers, and their report is not a certified real estate appraisal.

An appellate court's duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value. *Id.,* citing *James v. James* (1995), 101 Ohio App.3d 668, 680, 656 N.E.2d 399. A trial court must have a rational, evidentiary basis for assigning value to marital property. *Id.,* citing *McCoy v. McCoy* (1993), 91 Ohio App.3d 570, 576-578, 632 N.E.2d 1358.

{¶ 27} We will review the trial court's valuation of appellant's interests in the Tate Farms entities under an abuse of discretion standard, and determine if the trial court had "a rational, evidentiary basis for assigning value" to the subject marital property.

{¶ 28} Appellant further argues Mr. Cook's opinion was inadmissible under Evid.R. 703 and 705 which state the following, respectively:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing.

The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.

{¶ 29} Appellant argues "expert opinions may not be based upon other opinions and may not be based upon hearsay evidence, which has not been admitted." Appellant's Brief at 14. However, appellant does not elaborate on this statement. If appellant is referring to Mr. Cook's reliance on the Mast report, the report was admitted into evidence (Plaintiff's Exhibit LL), and Mr. Mast, Mr. Andrews, and Mr. White all testified and were subjected to vigorous cross-examination.

{¶ 30} Appellant also argues "there is no evidence in the record that Cook offered any opinions to a reasonable degree of legal or accounting certainty." Appellant's Brief at 14. The trial court recognized Mr. Cook as an expert witness, and appellant did not object to his status as an expert. T. at 262. Mr. Cook agreed he arrived at his opinion based upon his education, training, experience, and knowledge "in this area." T. at 267, 291. We find the absence of the magic words, "reasonable degree of certainty," does not render Mr. Cook's testimony inadmissible. *Coe v. Young,* 145 Ohio App.3d 499, 504, 763 N.E.2d 652 (11th Dist.2001).

{¶ 31} We do not find any violation of Evid.R. 703 and 705 as argued by appellant.

{¶ 32} Appellant further argues Mr. Cook's testimony "as a legal expert does not apply the correct contract law." Appellant's Brief at 14. Appellant argues Mr. Cook erroneously interpreted language in the company and partnership agreements regarding a "put" – "giving one partner or owner the right to demand an immediate payment of a calculated share without a majority vote or a unanimous vote." Appellant's Brief at 15. During the trial, the trial court specifically stated, "I'm not qualifying him [Mr. Cook] in anyway as a legal expert." T. at 272. The trial court is presumed to be able to

read, as described by appellant in his brief at 15, the "clear and unambiguous" language of the buy-sell provisions in the agreements.

{¶ 33} Settling on the capitalized excess earnings method (income approach), appellant's expert, Ms. Roche, valued appellant's interest in the company as of December 31, 2015, to be $635,000, and in the partnership, $95,200, for a combined valuation of $730,200 (discounts applied). Defendant's Exhibit 13. According to appellee's expert, Mr. Cook, appellant's combined interests in the Tate Farms entities as of December 31, 2015, was $4,589,000 using the fair value method (no discounts applied). Plaintiff's Exhibit KK. Between the two experts, the trial court was presented with the valuations of **$730,200** versus **$4,589,000**. In its March 30, 2017 decree of divorce at Exhibit C, the trial court valued appellant's interests in the Tate Farms entities at **$4,589,000**.

TATE FARMS FINANCIALS

The Partnership

{¶ 34} As found by the trial court, the partners determined the stated value of the partnership. Finding of Fact No. 79; T. at 1102. Each partner owned 25 percent of the partnership. Finding of Fact No. 69; T. at 38, 127, 1101; Plaintiff's Exhibit EE; Defendant's Exhibit 17.

{¶ 35} The December 30, 2014 partnership minutes indicate it was worth $5,018,817. Finding of Fact No. 72; Plaintiff's Exhibits X and FF; Defendant's Exhibit 17.

{¶ 36} The December 30, 2015 minutes indicate the partnership was worth $3,571,500. Finding of Fact No. 78; Plaintiff's Exhibits Y and FF; Defendant's Exhibit 17.

{¶ 37} The trial court noted in December 2015, all partners knew appellant was involved in a contested divorce proceeding. Finding of Fact No. 79.

{¶ 38} As explained by the trial court in Finding of Fact No. 97:

The underlying operating agreements for Tate Farms Company, Ltd., and Tate Farms, a partnership, specify that a partner's interest in each entity, pursuant to a buyout, shall be determined by using a process whereby the value of the asset is established and the particular partner exercising the buyout receives his fractional interest, without reduction of the total value, and including a consideration for his capital account.

{¶ 39} Pursuant to the above cited exhibits, in 2014, a partner's buyout was worth $732,200, and in 2015, a partner's buyout was worth $368,755. The figures were reduced from a strict 25 percent because a partner's buyout excluded the amount attributed to the grain inventory, $2,090,000 in 2014 and $2,096,500 in 2015. As explained by Mr. Hal Tate, starting in 2007, the grain inventory was excluded each year because it was used for operating expenses for "growing of next year's crops." T. at 1124-1125. Appellant understood he was not entitled to a percentage of the grain inventory if he walked away from the partnership. T. at 128-129. The trial court found excluding the grain inventory from the valuation of the partnership to be in error

because the value existed at the time.  Finding of Fact Nos. 76, 80, 81, 82.  Including the grain inventory to the buyout valuations would increase the 2014 valuation to $1,254,700 and the 2015 valuation to $892,875.

## The Company

{¶ 40} Appellant owns 24.5 percent of the company.  Finding of Fact No. 88; T. at 36, 1115.

{¶ 41} As found by the trial court, the December 30, 2014 company minutes indicate it was worth $9,053,300, using "historic costs" for the land, not "actual costs." Finding of Fact No. 91; T. at 1153-1154; Plaintiff's Exhibits Z and DD; Defendant's Exhibit 18.  Outstanding loans left a net equity of $7,013,300.  Finding of Fact No. 92. Appellant's buyout was worth $1,718,258.  Finding of Fact No. 93.

{¶ 42} The December 30, 2015 minutes indicates the company was still worth $9,053,300; however, outstanding loans had been lowered leaving a net equity of $7,735,800.   Finding of Fact No. 95; T. at 1154-1155; Plaintiff's Exhibit AA and DD; Defendant's Exhibit 18.  Appellant's buyout was worth $1,895,271.  Finding of Fact No. 96.

{¶ 43} The financial statement attached to the December 30, 2015 minutes indicates a true value of the land equaled $17,110,000, with a net equity of $15,792,500.  Finding of Fact No. 99; T. at 1155, 1157; Plaintiff's Exhibit AA and DD; Defendant's Exhibit 22.  Mr. Hal Tate explained they computed the land values because they were "very much aware of what real estate is selling for in the area and this is so important in farm real estate * * * and so we'd watch all the sales that were in vicinity so we have some reference point."  T. at 1102.  They honestly believed the value they

assigned to the real estate was the real value of the property. T. at 1150. Appellant acknowledged as of December 30, 2015, he owned 24.5 percent of $15,792,500 worth of land or $3,869,162, but in his opinion he was "not entitled to that" because demand notes needed to be deducted from the gross amount. T. at 140-141.

{¶ 44} The buy-sell agreement provided for consideration of each member's capital account. The trial court found appellant's capital account as of December 31, 2015, was over $1,600,000. Finding of Fact No. 98; T. at 89-90; Plaintiff's Exhibit B17. Appellant did not contribute to this capital account. T. at 78, 83, 88, 92. Accountants for the Tate Farms entities testified adjustments were made to the capital accounts in order to balance the balance sheet. T. at 782-783, 789, 802; Raese depo. at 28, 41-42.

{¶ 45} The agreement did not provide for any discounts, and applied a strict percentage of ownership to the total value ratio in determining each partner's share for a buyout. Finding of Fact No. 94; T. at 1163-1164. Using historic costs, appellant's company buyout in December 2015 would have been $1,895,271. Finding of Fact No. 96. Using true value, appellant's company buyout in December 2015 would have been $3,869,162. Finding of Fact No. 101. Mr. Hal Tate testified that "we established long ago that the [buyout] figure would be established at cost." T. at 1153. Appellant understood the same. T. at 139.

{¶ 46} Using the 2015 partnership valuation of $3,571,500 and the 2015 true value/net equity of the company of $15,792,500, the total value of the Tate Farms entities would equal **$19,364,000**. Doing the math, appellant's portion would be **$4,762,037.50**.

{¶ 47} Mr. Hal Tate testified appellant's 2015 total buyout value would be $1,411,000 and some change.  T. at 1139; Defendant's Exhibit 41.  Mr. Hal Tate took the company buyout of $1,895,271 and deducted the demand notes' principal ($331,255) and interest ($125,727), to reach a final figure of $1,438,289.  He took the partnership buyout of $368,775 and again deducted the demand notes' principal ($257,000) and interest ($138,634), to reach a final figure of negative $26,859.  Adding the two final figures together equals $1,411,430.  Finding of Fact No. 124.

### THE MAST REPORT

{¶ 48} Mr. Mast, Mr. White, and Mr. Andrews submitted an "Opinion of Value" on the Tate Farms entities dated March 1, 2016.  Plaintiff's Exhibit LL.  Appellant agreed they were qualified to do so.  T. at 161.  The first page of the report indicates its "purpose" is to establish fair market value for the Tate Farms entities (land, cattle, equipment).  The report clearly states it is not an appraisal.  Comparable sales in the local counties where the land was located were used as the basis for the land values.  A visual inspection of the subject land conducted.

{¶ 49} The report concluded the value for the land held by the company was $17,853,064.50 (not including outstanding liabilities).  Making an adjustment for the subtraction of two properties separately owned by appellant, the amount becomes $16,967,730.50.  T. at 167-168, 180.  Appellant agreed "they're probably in the ballpark."  T. at 1055.  Adjusting for the outstanding liabilities (net value) would lower the land value to $15,650,230.50

{¶ 50} The value for the assets held by the partnership was $5,794,400. Making an adjustment for the subtraction of an error in computing the value of cattle, the amount becomes $5,780,000. T. at 334.

{¶ 51} Given the adjusted figures, the total of the Tate Farms entities would equal **$22,747,730.50** (true value) or **$21,430,230.50** (net value). Doing the math, appellant's interests would be **$5,279,306.47** (using net value).

{¶ 52} As found by the trial court, the Mast report "is within 10% of total value of the internal documents generated by Tate Farms concerning the value of their assets." Finding of Fact No. 104.

{¶ 53} Appellant challenged the Mast report by presenting the testimony of Charles Snyder, a certified real estate appraiser. T. at 689-690. Mr. Snyder evaluated the Mast report and concluded although the individuals that created the Mast report were experts "in sale and marketing of such properties," their underlying opinions "are neither quantifiable or verifiable by a third party reviewer." Defendant's Exhibit 15. Mr. Snyder found "the results lacking credibility and therefore not meeting the necessary requires (sic) of the Appraisal Institute as well as the State of Ohio Division of Real Estate and USPAP." *Id.* On cross-examination, Mr. Snyder agreed historical cost of property was not appropriate in determining its current value. T. at 712.

{¶ 54} The Mast report clearly stated it was not an appraisal. Mr. Snyder did not appraise the land that was the subject of the Mast report. Appellant and the Tate Farms entities did not present any appraisals of the land owned by the Tate Farms entities. In fact, they argued against any appraisals in memorandums filed August 28, 2015.

THE COOK REPORT

{¶ 55} Appellee's expert, Mr. Cook, submitted a "Valuation of Mr. Bruce Tate's Equity Interest in Tate Farms Company, Ltd. and Tate Farms Partnership" dated June15, 2016.   Plaintiff's Exhibit KK.   He used two different methods to calculate valuation, "fair value" and "fair market value," but settled on the fair value method to determine his final valuation.

{¶ 56} Mr. Cook defined the fair value method in his report at page 1 as follows: " 'A judicial concept, defined differently in different states and countries.  It refers to an equitable, just and reasonable value for property determined without reference to a simulated or real market transaction since the property-holder has no interest in entering the market at all.' "   In his report at page 6, Mr. Cook stated in determining appellant's interests, he used the net asset approach.  He went on to explain, "[u]nder the fair value standard this approach determines value by estimating the market value of the assets and subtracting the value of the liabilities.  This is the method described in the buyout provisions of the partnership agreements."

{¶ 57} In his report at page 1, Mr. Cook explained fair market value is "the amount that a willing buyer will pay a willing seller, both having knowledge of all the relevant facts and neither being under any compulsion to buy or sell."  T. at 281.  In his report at page 6, Mr. Cook explained this method applies discounts for lack of marketability and lack of control.

{¶ 58} The report at page 2 indicates it is based on "financial information covering periods ending on or before December 31, 2015, and an appraisal report as of February 4, 2016 [Mast Report]."  Mr. Cook reviewed the Tate Farms agreements and

the meeting minutes, financial statements, and tax returns. Finding of Fact No. 106; T. at 264-267. He also performed a site visit, conducted interviews, and read several articles and publications. See, Cook Report, Plaintiff's Exhibit KK, Appendix A.

{¶ 59} In determining a valuation under the fair value method, Mr. Cook did not apply any discounts for lack of marketability or lack of control, explaining the following in his report at page 1:

Fair value is the estimated value to Mr. Tate and this is sometimes referred to as investment value. Under fair market value, the willing buyer is not Mr. Tate but is a hypothetical party buying a minority interest in the Tate Farms. As such (s)he will have little if anything to say about operations, distributions, sale or purchase of assets, etc. Given this lack of control and influence, the value is less than it is to Mr. Tate.

As described more fully in this report, both entities have agreements that provide Mr. Tate the ability to "put" his interests in the entities in exchange for the value of the net assets. There is no mention of any discounts for lack of marketability or lack of control in the agreements or in any company minutes or records that discuss the buyout values. Because of these agreements I believe fair value is the appropriate value to use in this matter.

{¶ 60} Mr. Cook did not consider any demand notes because they do not affect value, like a "mortgage on a house." T. at 432. He explained: "If those notes are

legitimate debt when you do all the (unintelligible) work they go on the other side of the balance sheet as a liability that will reduce his assets. But they don't impact the value of the business." *Id.* Mr. Cook admitted the demand notes "may have an impact on Bruce's wealth in total but not on the value of the business." T. at 433.

{¶ 61} Mr. Cook considered the buyout provisions for the entities. T. at 273, 275-277. Article IX, Section 9.02 of the company's agreement (Plaintiff's Exhibit CC, Defendant's Exhibit 18) states the following:

> 9.02 <u>Buyout of Membership Interest.</u> A Member may sell all of his Membership Interest in the Company to the other Member at a price agreeable to both members. If the members fail to agree upon a price, the member who desires to sell may resign as a member from the Company and shall receive the amount due and owing to him or her as determined by the books of said company, taking into account the value of all assets, liabilities, and the capital accounts of the members.

{¶ 62} Mr. Cook interpreted this buyout provision to mean "the value today of what these assets, liabilities are worth." T. at 276.

{¶ 63} He also considered Item 3 of the partnership agreement which states: "If for any reason one of the partners would elect to leave, their ownership would be figures (sic) as follows – the total value of all the assets minus all liabilities – then that partner would be entitled to 25% of that figure." T. at 277; Plaintiff's Exhibit EE; Defendant's Exhibit 17.

{¶ 64} Mr. Cook's estimated valuation computations are included in his report at pages 15-16. Making some adjustments and using Mast values, and including outstanding liabilities, Mr. Cook concluded the "Partners' Capital using asset values" equaled **$18,543,000**. Using an average of 24.75% to represent appellant's combined interests, he assigned **$4,589,000** to appellant's interests. Mr. Cook did not deduct the value of the grain inventory in his valuation of the partnership. He chose to ignore the fact that starting in 2007, the members specifically excluded the grain inventory in calculating a member's buyout value because the grain inventory was "an asset at the time of valuation" and provided "future value" that could be converted to cash. T. at 307-308, 467-468.

{¶ 65} However, using the internally prepared balance sheets prepared by the Tate Farms entities, Mr. Cook found the total of the Tate Farms entities would equal $19,364,000 ($15,792,500 for the company and $3,571,500 for the partnership). Appellant's portion would be $4,762,000. This amount is higher than Mr. Cook's own valuation.

{¶ 66} Because the $4,762,000 figure was derived from the internal documents of the Tate Farms entities which are not independent, Mr. Cook went with his valuation of $4,589,000 to be more in line with the Mast report as it was an independent evaluation. T. at 288-289.

THE ROCHE REPORT

{¶ 67} Appellant's expert, Ms. Roche, submitted a "Business Valuation Summary Letter Report" on the Tate Farms entities dated July 31, 2016, which included two separate reports, one for the company and one for the partnership. Defendant's Exhibit

13.  She used three different methods to calculate valuation, "net asset value method (asset approach)," "capitalized excess earnings method (income approach)" and "guideline company method (market approach)," but settled on the capitalized excess earnings method or income approach to determine her final valuation.  T. at 505, 512-513, 517, 520.  This approach is defined in her reports at page 7 as follows:

> This method is a hybrid of the assets and income approach for valuing the business and is based on the tangible net assets of the Company.  A company's tangible net assets should provide a current return to the owners.  Since there are risks associated with owning the company's assets, the rate of return should be the prevailing industry rate of return required to attract capital to that industry.

{¶ 68} Ms. Roche opined Mr. Cook's fair value method was better suited for shareholder disputes, mergers, sales, and buy-outs.  T. at 516.

{¶ 69} Page 1 of the reports indicate they are based on "historical financial information provided to us by third parties."  Ms. Roche reviewed portions of the Tate Farms agreements, meeting minutes, financial statements, tax returns, and also read several articles and publications, including USDA land values.  See, Roche Report, Defendant's Exhibit 13, Tab 2; T. at 495, 499, 521, 575.  However, she primarily used the tax returns which contained the book values to the subject land.  T. at 496, 501, 513, 517, 520, 576.  Book values represent historic cost, not the current true values.  T. at 576.  Some of the land has been on the books since 1997.  T. at 578.  She did not

include information from the minutes as part of her evaluation. T. at 496. She used portions of the Mast report in "some of the appreciation calculation," but did not use it in valuing the entities. T. at 566, 569, 603. She was not given the complete Mast report as the pages pertaining to the partnership assets were omitted. T. at 569-570, 602-603. Although she reviewed the Tate Farms financial statements, she did not compare the values therein with the values contained in the Mast report. T. at 575-576. She did not use the financial statements to support her valuations, just the tax returns. T. at 576.

{¶ 70} Ms. Roche applied discounts to the valuations, explaining the following in her reports at page 10:

We determined that a discount for lack of control (Minority Discount) of 20% is necessary as the ownership in question is a minority interest. The minority owner does not carry enough influence to control Company decision making, is key to the operations of the Company and is disadvantaged by being unable to pursue other opportunities. Additionally, we determined that a discount for a lack of marketability (Marketability Discount) of 20% is necessary to indicate that the ownership is that of a small, family owned farm operation with restrictions on the sale of the partnership interest.

{¶ 71} She applied the discounts even though the company agreement specifically excludes discounts in the buy-sell provision. T. at 585-586. On cross-

examination, she agreed she may not have read that provision. T. at 574, 586. She also agreed the 20 percent figure was subjective. T. at 507-508.

{¶ 72} Ms. Roche took into consideration the fact that appellant's interests in the company are "subject to an on demand note in the amount of $331,255 plus interest at 4% per year or $125,727 in total, as of December 31, 2015" for the company, and "subject to an on demand note in the amount of $257,000 plus interest at 4% per year or $113,080 in total, as of December 31, 2015" for the partnership (a total demand note with interest of $827,062). She would expect the demand notes to be paid if the assets were transferred from appellant to a third-party buyer. T. at 509. In determining her valuation, Ms. Roche assumed the buyer would assume the demand notes and pay the debt. T. at 602.

{¶ 73} In determining a value for the partnership, Ms. Roche examined the tax returns for the partnership and determined the partnership took accelerated depreciation over several years. T. at 501. Because she felt that was not appropriate for valuing the partnership, she added the depreciation back in, in the amount of $2,400,000. T. at 501, 515.

{¶ 74} She did not consider any of the buyout calculations for the entities. T. at 505-506, 584.

{¶ 75} The report concluded the rounded value for the land held by the company equaled $1,706,200, with appellant's portion being $635,000. Because her calculation was derived from book values, she considered USDA land values "to get an average of land value for land in Ohio." T. at 514. Based on those values, she increased her calculation of the land value by $137,900. T. at 517-518, 578, 580. In using the USDA

values, she took the total acreage and assumed one-third farm real estate, one-third cropland, and one-third pasture.  T. at 580, 592-593.  She did not verify her assumptions.  T. at 580.  She agreed her valuation was hypothetical because she did not have the benefit of an appraisal.  T. at 581.

{¶ 76} The rounded value for the assets held by the partnership was $727,000, with appellant's portion being $95,200.

{¶ 77} Given these figures, the total of the Tate Farms entities would equal **$2,433,200**, with appellant's portion being **$730,200**.

{¶ 78} Based upon the foregoing, the trial court had before it the following values for the Tate Farms entities: $19,364,000 (financials including grain inventory and using true value/net value), $21,430,230.50 (Mast report, net value figure), $18,543,000 (Cook report), and $2,433,200 (Roche report).  Based on these figures, appellant's interests in the Tate Farms entities varied from $5,284,537.50 (financials) to $5,279,306.47 (Mast report) to $4,589,000 (Cook report) to $730,200 (Roche report).

THE TRIAL COURT'S CONCLUSIONS ON VALUATION

{¶ 79} From all of its findings, the trial court concluded the following:

20. The Court heard extensive testimony with respect to the value of Tate Farms.  With respect to the testimony of Hal Tate, in which he articulated that Defendant would have been entitled [to] $1,411,430 as the time of buyout, the Court finds this is not determinative of Defendant's buyout because it underestimates, by about 50%, the value of real estate, and because it deducts over $2,000,000 of assets [the grain inventory]

owned by Tate Farms partnership as of December 31, 2015, and due to the fact that Defendant did not sell his interests as of that date, but is continuing on an ongoing basis to participate in that operation.

21. Cathy Roche's report with respect to the value of Tate Farms is unpersuasive. She did not utilize the appropriate true values, and her reliance upon historic costs and the USDA values for farmland across the State of Ohio, which she then assumed would be equally applied to Tate Farms in terms of real estate value, crop land values and pasture land values, makes her underlying data unsupported and unsupportable.

22. The Tate Farms' internally generated documents for 2013-2015 shows that Tate Farms Company Ltd. valued their land real estate holdings at over $17,000,000 for each of those years. That was similar to the Mast appraisal which also valued the land at over $17,000,000. The Court determines that is, as a matter of law, the real value of Tate Farms Company Ltd. is in excess of $17,000,000.

23. With respect to the value of Tate Farms partnership, the Court finds again that the numbers utilized by Cathy Roche are not supportable. The Court finds that the hard assets of Tate Farms partnership as of December 31, 2015 are approximately $3,500,000.

24. The Court further finds that the adjustment made by Cathy Roche imputing $2,400,000 of additional value to recognize the accelerated depreciation taken by Tate Farms is appropriate to consider in making an equitable distribution of assets.

28. The value of the Tate Farms Company Ltd. assets, as of December 31, 2015, is somewhere between $17,110,000 as reported by the Tate Farms internal appraisals, and $17,853,064.50 as reported by the Mast appraisal. Defendant owns a 24.5% interest in same.

29. As of December 31, 2015, there was a debt associated with Tate Farms Company Ltd. which left equity of $15,792,500. Multiplying 24.5% of that would demonstrate that Defendant has, as an ongoing ownership interest in Tate Farms Company Ltd. the sum of $3,869,162.50.

30. With respect to Tate Farms partnership, the Court determines the value of same to be somewhere between $3,571,500 as reported by the Tate Farms internal appraisals, and $5,794,400 as reported by the Mast appraisal, as of December 31, 2015. In addition to the $3,571,500 reported by Tate Farms, the Court notes that there was another $2,400,000 referenced in the Roche report that she attributed to an adjusting entry necessary to reflect the true values of the assets given the fact that the farm had taken so much accelerated depreciation which distorted their internal bookkeeping values. As such, the true value of Tate Farms partnership assets are somewhere between $5,794,400 and $5,971,500.

31. Defendant has a 25% ownership interest in the partnership, and 25% of the $5,794,400 is $1,448,600.

32. The trial court is not bound to utilize fair market value for purposes of establishing a distribution of assets in a divorce case. The

Court is charged, in a divorce case, with determining an appropriate and reasonable determination of value necessary to make an equitable distribution of the parties' assets.

33. The Court finds that the utilization of fair value as demonstrated by John Cook provides the most equitable numbers upon which to value the property based upon all of the factors, testimony and exhibits presented, including reference to the provisions of R.C. 3105.171.

{¶ 80} Based on the trial court's conclusions, the value of the Tate Farms entities would be $21,586,900, with appellant's interests equaling $5,317,762.50 ($3,869,162.50 plus $1,448,600). However, in the attached exhibit to the findings of fact and conclusions of law, Exhibit C, the trial court placed the value of $4,589,000 in the column representing appellant's interests in the Tate Farms entities. The trial court did not pull this value out of thin air. The value corresponds to the Cook valuation which was in line with the Mast report. Appellant himself agreed the Mast report was "probably in the ballpark" as to the land value. ¶ 52, *supra*. Also, appellant acknowledged his interest in the company was worth $3,869,162. ¶ 46, *supra.* In the same exhibit, underneath appellant's value in the Tate Farms entities, the trial court gave appellant a credit for the outstanding demand notes in the entities in the amount of $852,616, in effect reducing appellant's interests to $3,736,384.

{¶ 81} As for appellant's argument that Mr. Cook's fair value analysis failed to consider the buy-sell provisions in the agreements, Mr. Cook testified he considered the provisions, and in fact included them in his report at page 9. T. at 273, 275-277. After

reviewing the wording of the provisions and the minutes that set values, Mr. Cook determined in his report at 9 that "there is no lack of marketability or lack of control discount. This provides strong support for fair value instead of fair market value." Appellant's expert, Ms. Roche, testified she did not consider the buy-sell provisions in her analysis. T. at 505-506, 584.

{¶ 82} Appellant also argues the trial court abused its discretion in ignoring the provision to exclude the grain inventory from the partnership buyout valuation and in refusing to enforce the buy-sell provisions. Appellee's Brief at 16-17.

{¶ 83} As explained by Mr. Cook, the grain inventory was an asset at the time of valuation and could be converted to cash. We do not find the trial court abused its discretion in agreeing with this assessment, even though the inclusion of the grain inventory was not contemplated by the parties in the event of a buyout. We agree with appellee's argument that a "trial court is charged, in a divorce setting, not with determining the enforceability of buy-sell agreement, it is charged with the task of determining what a spouse's real value in interest is in marital assets." Appellee's Brief at 17. Appellant was not interested in selling his interests in the Tate Farms entities. Finding of Fact No. 74; T. at 90. He hoped to remain in farming. T. at 149. Appellant's buyout valuation supplied by the Tate Farms entities deducted the grain inventory (a current asset for the partnership), and was based on historic cost land values and adjusted capital accounts for the company. Historic cost is in no way indicative of the land's value and appellant's interest therein given that the land was held or purchased over the course of the parties' eighteen year marriage. We do not find the trial court abused its discretion in refusing to enforce the nebulous buy-sell provisions.

{¶ 84} Upon review, we cannot say that the trial court abused its discretion in finding Mr. Cook's valuation credible. Mr. Cook's valuation is more in line with the values reached in the Mast report and the financial statements from the Tate Farms entities, and he considered the agreements between the members, including the buy-sell provisions. Ms. Roche used historic costs and arbitrary USDA values, and did not consider the agreements and the buy-sell provisions. The trial court considered all of the relevant circumstances that affected the value of appellant's interests in the Tate Farms entities. Given all of the testimony and evidence presented, we find the trial court had "a rational, evidentiary basis" in assigning the valuation to appellant's interests in the Tate Farms entities, and the valuation is supported by the evidence.

{¶ 85} Lastly, appellant argues the property division directly contravenes Exhibit C as to the awarding of attorney fees to appellee. Exhibit C contains several references to attorney fees and litigation fees due to Mr. Cook. An award of attorney fees and/or expert fees is an award separate and apart from the division of the parties' assets and liabilities and should not have been included in the context of Exhibit C. R.C. 3105.171 and 3105.73. Therefore, all amounts attributable to attorney and expert fees are hereby removed from Exhibit C.

{¶ 86} The trial court clearly found an award of attorney fees was not justified, warranted, or equitable, and ordered each party to pay their own fees and litigation expenses. Finding of Fact No. 123; Conclusion of Law No. 42; March 30, 2017 Decree of Divorce. Litigation expenses includes expert fees *i.e.,* Mr. Cook. All amounts associated with attorney fees and expert fees previously included in Exhibit C are reversed. The trial court's order in Conclusion of Law No. 43 and the divorce decree

requiring appellant to pay appellee $3,400 for one half of the fee associated with obtaining an "appraisal" (the Mast report) is supported in the record via the trial court's January 7, 2016 judgment entry.  T. at 236, 662; Plaintiff's Exhibit SS2.

{¶ 87} Per the trial court's November 2, 2015 judgment entry at Item 5, the trial court ordered a PNC account of the parties "consisting of approximately $69,345.97 be closed and half of the then total be sent" to their respective attorneys to be held in trust accounts for the payment of interim attorney fees.  *See also* Finding of Fact No. 43. Therefore, the amount of $3,610 listed in appellee's column in Exhibit C labeled "Trust account balance at Law Office of Lon Vinion" belongs to appellee for attorney fees and litigation expenses.

{¶ 88} New figures for Exhibit C pursuant to this court's decisions will be addressed at the end of this opinion.

{¶ 89} Assignment of Error I is affirmed in part and reversed in part.  Assignment of Error II is denied.

III

{¶ 90} In his third assignment of error, appellant claims the trial court abused its discretion in failing to consider the tax consequences of forcing him to pay the equitable award of $1,479,542.57 and imposing a hold harmless provision.  We disagree.

{¶ 91} Appellant argues the trial court ignored the factors set forth in R.C. 3105.171(F)(6) and (7) which state the following:

In making a division of marital property and in determining whether to make and the amount of any distributive award under this section, the court shall consider all of the following factors:

(6) The tax consequences of the property division upon the respective awards to be made to each spouse;

(7) The costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property[.]

{¶ 92} However, several appellate districts, including this one, have determined that a trial court does not need to consider tax consequences that are speculative. *Nieman v. Nieman,* 3d Dist. Allen No. 1-15-30, 2015-Ohio-5186; *Forchione v. Forchione,* 5th Dist. Stark No. 2012CA00085, 2013-Ohio-1761, ¶ 20; *Lewis v. Lewis,* 7th Dist. Jefferson Nos. 06JE49& 07JE27, 2008-Ohio-3342; *Thomas v. Thomas,* 171 Ohio App.3d 272, 2007-Ohio-2016, 870 N.E.2d 263 (1st Dist.); *Rosenberger v. Rosenberger,* 11th Dist. Geauga No. 2004-G-2555, 2005-Ohio-1790; *Gest v. Gest,* 9th Dist. Lorain No. 96CA006580, 1998 WL 208872 (Apr. 29, 1998); *James v. James,* 101 Ohio App.3d 668, 688, 656 N.E.2d 399 (2d Dist.1995).

{¶ 93} Conversely, as explained by the *Nieman* court at ¶ 13, citing *Day v. Day,* 40 Ohio St.3d 155, 159, 532 N.E.2d 201 (10th Dist.1988):

There is no dispute in this case that if an asset, such as a business, is being sold at the time of a divorce, the tax consequences are not too speculative for a trial court to consider.  Similarly, there does not seem to

be a dispute that if a property distribution in a divorce *requires* a business to be sold to equitably distribute the assets, tax consequences are also properly considered.  (Emphasis sic.)

{¶ 94} Although the trial court ordered the immediate listing of the SR 39 farm "[i]n the event Defendant is unable to obtain financing within 30 days of the date of this order" to pay appellee the equitable award, there is no evidence of appellant's need or intention to sell the SR 39 farm.  Finding of Fact No. 37.  Appellant has substantial assets and may be able to secure a loan to pay appellee.  There is no indication that the trial court's equitable order will effectively force appellant to sell the SR 39 farm or his interests in Tate Farms for that matter.  Because there is no evidence of a possible sale, any tax rate applied by the trial court would be speculative.  No one testified as to the tax consequences of a liquidation.

{¶ 95} Appellant challenges the trial court's adoption of a hold harmless provision, specifically, the one included in the divorce decree extending to the Internal Revenue Service:

> Additionally, Bruce Tate shall hold Robyn Tate harmless for any and all claims or demands made by the Internal Revenue Service or the State of Ohio Department of Taxation on account of improperly filed joint tax returns during the parties' marriage, including for any and all back taxes owed, in addition to any interest and penalties.

{¶ 96} As noted by the trial court in Finding of Fact No. 127, "The parties presented evidence indicating that there were business decisions made, including tax treatments, that impacted Defendant and Plaintiff that were made solely by Tate Farms." *See also* Finding of Fact Nos. 27 and 28. The trial court adopted the hold harmless provision to "achieve finality and an equitable distribution of the parties' assets, debts and other responsibilities," and to protect "both parties and Tate Farms from any claims of third parties lodged against either Plaintiff, Defendant or Tate Farms, over which one or more of the parties had no control." Finding of Fact No. 127.

{¶ 97} Appellant argues the cited hold harmless provision would hold appellee harmless from any tax consequences of a "liquidation and distribution," making him responsible for the entire tax obligation on a marital asset. Appellant's Brief at 24. Again, there is no indication of a liquidation.

{¶ 98} Upon review, we find the trial court did not abuse its discretion on the tax consequences and in imposing a hold harmless provision regarding the IRS.

{¶ 99} Assignment of Error III is denied.

IV

{¶ 100} In his fourth assignment of error, appellant claims the trial court's finding that he committed financial misconduct is against the manifest weight of the evidence. We agree.

{¶ 101} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact]

clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541; *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517. In weighing the evidence, however, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley* at ¶ 21. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Id.* at ¶ 19.

{¶ 102} We note a determination on financial misconduct rests on the facts and circumstances of each case. *Orwick v. Orwick,* 7th Dist. Jefferson No. 04 JE 14, 2005-Ohio-5055. As such, the trier of fact is given the duty to determine the credibility of each party's assertions in determining financial misconduct. *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990); *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

{¶ 103} R.C. 3105.171 governs division of marital property. Subsection (E)(4) states: "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property."

{¶ 104} As stated by this court in *Kilpatrick v. Kilpatrick,* 5th Dist. Delaware No. 10 CAF 09 0080, 2011-Ohio-443, ¶ 29-30:

The trial court has discretion in determining whether a spouse committed financial misconduct, subject to a review of whether the determination is against the manifest weight of the evidence. *Boggs v. Boggs,* Delaware App. No. 07 CAF 02, 2008-Ohio-1411 at paragraph 73, citing *Babka v. Babka* (1992), 83 Ohio App.3d 428, 615 N.E.2d 247.

Financial misconduct implies some type of wrongdoing such as interference with the other spouse's property rights. *Bucalo v. Bucalo,* Medina App. No. 05CA0011-M, 2005-Ohio-6319. The burden of proving financial misconduct is on the complaining party. *Gallo v. Gallo,* 2002-Ohio-2815, Lake App. No.2000-L-208.

{¶ 105} As found by this court in *Shalash v. Shalash,* 5th Dist. Delaware No. 12 CAF 11 0079, 2013-Ohio-5064, ¶ 24:

To find financial misconduct, a court must look to the reasons behind the questioned activity or the results of the activity and determine whether the wrongdoer profited from the activity or intentionally dissipated, destroyed, concealed, or fraudulently disposed of the other spouse's assets. *Thomas v. Thomas,* 2012-Ohio-2893, 974 Ohio App.3d 679, ¶ 63 (5th Dist.).

{¶ 106} Between 2005 and 2009, appellant withdrew $146,000 from the parties' joint bank account and invested the money in the stock market. Finding of Fact No. 31;

T. at 103, 105-106.  Appellant testified he lost all of the money in the stock market.  Finding of Fact No. 32; T. at 103-104.  However, his tax returns from 2005 to 2015 only showed a capital gains loss of $41,861.  Finding of Fact No. 33; T. at 104.  The trial court found appellant was unable to account for the difference.  Finding of Fact No. 34.  From its findings, the trial court concluded the evidence demonstrates appellant "misappropriated or misused $146,000 of the parties' joint marital bank account monies," and found him guilty of financial misconduct.  Conclusion of Law No. 19.

{¶ 107}  Appellant points out that the conduct that formed the basis of the finding of financial misconduct occurred between 2005 and 2009, six to ten years before the parties filed for divorce.  Appellant's Brief at 25; T. at 102-103.

{¶ 108}  As noted by our brethren from the Fourth District in *Jacobs v. Jacobs,* 4th Dist. Scioto No. 02CA2846, 2003-Ohio-3466, ¶ 23, "investing, even poor investing, is neither wrongdoing nor financial misconduct and we will not construe the statute so broadly as to include investment mistakes."   "[T]here must be some showing of wrongdoing or interference with the offended spouse's property rights before a showing of financial misconduct can be predicated on a party's investment strategy."  *Mikhail v. Mikhail,* 6th Dist. Lucas No. L-03-1195, 2005-Ohio-322, ¶ 32.

{¶ 109}  As in *Jacobs,* there is no evidence in this case that the investment losses were purposely incurred.  There is no evidence that appellant made investment decisions in anticipation of a divorce six to ten years in the future to intentionally dissipate appellee's share of the marital estate.  There is no evidence of "wrongdoing" or "interference" with appellee's property rights.  Appellee was aware of the investments and the losses.  T. at 101-106, 626-627.

{¶ 110} We find the weight of the evidence does not support the conclusion that appellee met her burden to establish financial misconduct on the part of appellant.

{¶ 111} Upon review, we find the trial court's decision on financial misconduct was against the manifest weight of the evidence. The amount associated with financial misconduct included in Exhibit C is reversed.

{¶ 112} As stated above, new figures for Exhibit C pursuant to this court's decisions will be addressed at the end of this opinion.

{¶ 113} Assignment of Error IV is granted.

V

{¶ 114} In his fifth assignment of error, appellant claims the trial court abused its discretion in awarding appellee spousal support in the amount of $1,000 per month for six years. We disagree.

{¶ 115} A trial court has broad discretion in determining a spousal support award. *Neville v. Neville,* 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434; *Stevens v. Stevens,* 23 Ohio St.3d 115, 492 N.E.2d 131 (1986); *Blakemore, supra.*

{¶ 116} R.C. 3105.18 governs spousal support. Subsection (C) states the following:

(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment,

provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 117} The parties were married for over eighteen years. Finding of Fact No. 116; T. at 684-685. At the time of the hearings, appellee was 42 and appellant was 46. Finding of Fact No. 114. "Each is in relatively good physical, emotional and mental health." *Id.*

{¶ 118} During the course of the marriage, appellant was employed exclusively with Tate Farms, and appellee was employed outside the farm, contributing over $1,100,000 to the marital estate. Finding of Fact Nos. 8, 17, 29, 108; T. at 30, 50-51, 609-610, 618; Plaintiff's Exhibit C; Defendant's Exhibit 32. For at least the first decade of the marriage, the parties were primarily supported by appellee's earnings while appellant "was earning less than he otherwise could have" because he "took lower wages in an effort to build sweat equity in his farming entities." Finding of Fact Nos. 16, 30, 110, 112; T. at 54-55, 622-623; Plaintiff's Exhibit D; Defendant's Exhibit 32.

{¶ 119} Between 2010 and 2014, appellant's taxable income ranged from approximately $183,000 to $267,000. Finding of Fact No. 18; T. at 67-68, 71-73;

Plaintiff's Exhibits B12-B16 and D; Defendant's Exhibit 37. However, appellant testified he was earning either $36,000 or $60,000 per year as a "draw" from the farm, and he never received the difference from his reported earnings as it had something to do with the partnership. T. at 60-61, 63, 76. He understood that the difference went back into the farm. T. at 60-61, 63. Appellee corroborated the fact that appellant did not receive the difference and it went back into Tate Farms. T. at 943-944. Appellant also received $15,000 per year renting his SR 39 farm. Finding of Fact Nos. 26, 63; T. at 57.

{¶ 120} Appellant also received benefits from the Tate Farms entities such as a motor vehicle, gasoline for the vehicle, "car insurance, car repairs and maintenance, license and tags, a cell phone, payments on his real estate insurance for his home, all yard maintenance, including all lawn care and snow removal at his personal home, health insurance, plus food such as the occasional half beef or half hog, and a retirement account." Finding of Fact No. 25; T. at 94-96. The trial court found these benefits amounted to "approximately $1,000 per month or $12,000 per year." Finding of Fact No. 25. Appellee will have to pay for these items. Finding of Fact No. 25; T. at 624-625, 944.

{¶ 121} The trial court found appellant's "income is variable, but based upon his taxable income over the past six years, his retained earnings, his perquisites, his separate land rent, and taking into account his 179 paper deductions," his income is "at least two to four times" what appellee makes each year. Finding of Fact No. 111.

{¶ 122} From these findings, the trial court specifically stated it was obligated to consider the factors in R.C. 3105.18(C) and concluded the following at Conclusion of Law No. 40:

40. Based upon the testimony and evidence presented, including Plaintiff's contribution to the marital estate, the disparity in gross remuneration and compensation of each of the parties, taking into account wife's employment at Holmes-Wayne Electric, Defendant's draw, his land rent, his perquisites including free car, free gasoline and all free automobile expenses, free health insurance, cell phone and related expenses, and his ongoing contribution back into the farm entities from earnings and income associated with those entities, and taking into account the fact that Defendant was able to obtain enough money to construct a $250,000 home when he separated from Plaintiff, from his family who are also his employers, on nothing more than a demand note, the Court finds that any award of spousal support is warranted. The Court awards Plaintiff the sum of $1,000.00 per month for seventy-two (72) months commencing March 1, 2017 by mandatory wage withholding through the Holmes County Child Support Enforcement Agency (HCCSEA), plus poundage. This award is subject to standard conditions of termination. The Court reserves jurisdiction to affect this order.

{¶ 123} The divorce decree provided for spousal support to terminate in the event of appellee's death, remarriage, or cohabitation. The trial court also reserved jurisdiction "to alter the terms and amount of the spousal support as circumstances dictate herein."

{¶ 124}  Based upon the state of the record, we cannot say the trial court abused its discretion in awarding spousal support to appellee.

{¶ 125}  Assignment of Error V is denied.

VI

{¶ 126}  In his sixth assignment of error, appellant claims the trial court erred in imposing an interest rate of 7 percent per annum.  We agree.

{¶ 127}  In the divorce decree, the trial court stated the following:

All monies ordered to be paid as a property distribution herein or for the payment of attorney fees and litigation expenses as set forth herein, shall be deemed a judgment for purposes of R.C. 1343.03, and if not paid within the timeframes ordered herein, shall accrue interest at the statutory rate pursuant to R.C. 5703.47 at the rate of 7% per annum until paid in full.

{¶ 128}  The trial court ordered appellant to pay appellee a lump sum payment of $1,479,542.57 within thirty days of the date of the order.  Conclusion of Law No. 35; Decree of Divorce filed March 30, 2017.

{¶ 129}  Pursuant to R.C. 1343.03 and 5703.47, the current interest rate is 4 percent.  *Wenger v. Wenger,* 9th Dist. Wayne No. 07CA001, 2007-Ohio-6003, ¶ 19. We do not find appellant's pursuit of an appeal changes the character of the lump sum payment to one "over time" as argued by appellee in her appellate brief at 29.

{¶ 130}  Upon review, we find the trial court erred in imposing an interest rate of 7 percent.  We hereby enter an interest rate of 4 percent.

{¶ 131}  Assignment of Error VI is granted.

{¶ 132}  Based upon the decisions herein, we amend Exhibit C as follows:

REMOVED FROM APPELLANT'S COLUMN:

1) $146,000 for "Money dissipated from the parties' marital assets (2005-09)" per ¶ 114.

2) $21,000 for "Amount paid in attorney fees in August and September" as the amount came from appellant's bank account (Finding of Fact No. 45) and pertains to attorney fees.

3) -$50,000 for "Payment to Robyn as an award of attorney fees" per ¶ 89.

REMOVED FROM APPELLEE'S COLUMN:

All of the references to attorney fees per ¶ 89:

1) -$16,431.55 for "Attorney fees due and owing as of date of trial."

2) -$6,211.43 for "Litigation fees due to John Cook as of date of trial."

3) -$53,823.45 for "Additional attorney fees due and owing since trial (10/13/16)."

4) -$12,907.17 for "Additional litigation fees due to John Cook since trial (9/30/16)."

5) $3,610.00 for "Trust account balance at Law Office of Lon Vinion" per ¶ 90.

6) $50,000.00 for "Payment from Bruce for attorney fees."

{¶ 133} A recalculation of the columns gives appellant $3,874,211.62 and appellee $1,067,890.08. The difference between the two is $2,806,321.54; divided by two equals $1,403,160.77. The equitable award appellant owes appellee is $1,403,160.77 at 4 percent interest per ¶ 133. Appellant also owes appellee $3,400 per ¶ 89.

{¶ 134} The judgment of the Court of Common Pleas of Holmes County, Ohio, Domestic Relations, is hereby affirmed in part, reversed in part, and judgment entered.

By Wise, Earle, J.

Delaney, P.J. and

Gwin, J. concur.

EEW/db